1817.

Decouche
v.
Savetier.

Decouche and others *against* Savetier and others.

*December 20th.* Rights dependent on the nuptial contract, are governed by the *lex loci contractus.*
A contract of marriage, executed in *Paris,* between *French* citizens, contained a clause (*donation mutuelle,*) by which the parties mutually gave to each, and the survivor, all the estate and property, acquired, or puchased, or belonging to either, at the time of his or her death, to be enjoyed by the survivor exclusively: the husband, afterwards, abandoned his wife, and came to reside in *New-York,* where he lived many years. having acquired a large personal estate, and died intestate, without lawful issue, leaving his wife living in *France: Held,* that the wife, as survivor, took all the estate, under the donation, according to the law of *France,* to the exclusion of the relations of the husband; and that her legal representatives, after her decease, were entitled to the whole, including not only what originally entered into *communaute* under the contract, but the separate property intended, in case of issue living at the death of either, to go to the children, as well as the joint increase of the common stock, during the life of the intestate, and the increase thereof, since his death, in the hands of the administrator.

No lapse of time is a bar to a direct *trust,* as between *trustee and cestui que trust.* Therefore, an *administrator,* being a trustee, cannot set up the statute of limitations in bar to the next of kin, or persons entitled to the distribution of the *assets.*

But where a person takes possession of property in his own right, and is afterwards, by matter of evidence, or construction, changed into a trustee, lapse of time may be pleaded in bar.

An Executor cannot plead the statute of limitations in bar to a *legacy,* though he may against a creditor.

The time of limitation of actions depends on the *lex fori,* and not on the *lex loci contractus.*

THIS was an amicable suit, brought for the purpose of obtaining the sanction of this court to a compromise of the controversy between the parties, some of whom were infants, and, therefore, not legally bound by their voluntary assent to the settlement proposed. The bill, which was filed *September* 3, 1817, stated, that on the 24th of *January,* 1787, *Claude J. F——,* then of the city of *Paris,* contracted marriage with *Madelaine S——,* of the same place, and were then and there married. Previous to the marriage, and in contemplation thereof, *marriage articles,* (*un contrat de mariage,*) were executed by

them, the 22d of *January*, 1787, before public notaries, in due form, and by the consent of parents, &c. and by which they stipulated as follows : " That there shall be a *community of property* between them, according to *the Custom of Paris*, which is to govern the disposition of the property, though the parties should hereafter settle in countries where the laws and usuages are different or contrary : (*a*) That neither of the parties shall be bound by the debts or hypothecations of the other before the marriage, but such debts are to be paid out of the property of the contracting party only. That *C. J. F.* (the husband, declares that his property consists of *two thousand livres*, in merchandise, goods, and cash, arising from his thrift and economy. The uncle of *M. S.* (the wife,) settles on her in dowry, or marriage portion, in advance or anticipation of the future inheritance of her father and mother, *six hundred livres ;* her parents to contribute each one half thereof, and which sum the uncle declares he has received from her parents, and has paid it to *C. J. F.* (the husband.) The wife, as a further marriage portion, advances fourteen hundred livres, consisting of chattels and ready money, the proceeds of her own thrift and economy, and which last sum *C. J. F.* (the husband,) agrees to be *chargeable with,* in consequence of the marriage. That of the goods of the parties, there *shall be placed in common, five hundred livres,* and the *residue,* with what shall be acquired thereafter, by succession, gift, legacy, or otherwise, shall be *in severalty,* to the person to whom the same shall come, and the representatives of that person exclusively, in the line of representation (*b*) That *C. J. F.* (the

(*a*) "Les futurs epoux seront communs en biens, 'suivant la Coutume de *Paris*, qui regit la dit communaute et en reglera le partage, encore que, par la suit, ils fassent leur demeures ou des acquisitions en pays ou les lois et usages seroient contraries, aux quelles ils derogent expressément par ces presentes."

(*b*) " Des biens des futurs epoux, il en entrera de part et d'autre, en communaute une somme de cinq. cents livres, et le surplus, ensemble ce qui lieur viendra par la suita, par succession, donation, legs, *ou outrement,* leur sera et demeurera propre en aux leur de cote et ligne."

husband,) endows and settles on *M. S.* (his wife,) *one thou-sand livres*, to be enjoyed by her, as soon as she shall be entitled to dower, and to remain and be the property of the children of the marriage. That the survivor shall take, *per preciput*, (*a*) out of the *common property*, before any distribution, such articles of furniture as the survivor shall choose, according to appraisement, without regard to the sale price, or the amount in ready money at the election of the survivor. That if any of the chattels *held in severalty*, shall be disposed of during the marriage, they shall be replaced, *pursuant to custom*, and the remedy for the same shall follow the nature of and rules which regulate real property, and shall belong exclusively to the one entitled. That the *wife and her children, on renouncing all the said common property*, may resume all that she brought into the common fund, together with whatever shall devolve upon her during her marriage. That if the wife renounces, she may take back, besides her stipulated dowry, *the preciput*, or the stipulated sum, aforesaid, and the whole to be clear of debts, or hypothecations, by virtue of the said community of goods, and from which she shall be discharged and indemnified by her husband, &c. That the said parties *mutually give to each, and to the survivor, all the estate and property acquired or purchased and belonging to either party, at his or her death, to be enjoyed by the survivor exclusively.* This donation, not to take place, if at the death of the party first dying, there should then be children living of the marriage; but if any such children should afterwards die, the donation to resume its force. (*b*)

(*a*) Vide Pothier, Trait de la Comm. p. 1. ch. 3. s. 2. art. 7. s. 1. *Ferriere* sur l'article 229 *de coutume de Paris* s. 2. *Code Napoleon*, art. 1515.

(*b*) "Ils se font donation mutuelle et reciproque, en la meilleure forme et maniere que donation puisse valoir et avoir lieu, l'un a l'autre, et au survivant d'eux ce accepte par les S. et Demoissella, futurs epoux pour le dit survivant de tous les biens, meubles et immeubles, acquetes, conquetes propres et autres qui pourront appartenir au premier mourant, au jour de son deces, a quelque som-

"That the parties continued to live together until 1792, and during that time had two children, both of whom died during the life time of their mother, and in infancy, and without making any disposition of their property.

That, in 1792, *C. J. F.* the husband, left *M.* his wife, and refused to cohabit with her, and abandoning her and the family, he left *France*, with a woman who took her name and personated her, and went to *Martinique*; from thence they came to the *United States* and settled in *New-York*, where he established himself, as a jeweller. The woman who so accompanied him from *France*, passed as his wife, and they cohabited together until his death. During their cohabition, they had several children, (defendants,) all of whom are living, the eldest being of age, the second nineteen years, and the third fifteen years of age. The husband died on the 10th of *June*, 1810, intestate, possessed of a personal estate in money, goods, and securities for money. On the 21st of *June*, 1810, letters of administration were granted to *M. F.* (the woman who so personated the wife,) who possessed herself of the personal estate, appropriated the *one third* thereof to her own use, procured herself to be appointed guardian of her children, and retained the other *two thirds*, as their distributive share. On the 19th of *March*, 1812, the said administratrix made her will, and gave all her estate equally to her three children, and made the defendants (*S—r* and *S—u*) her executors, with directions to convert her estate into money, to educate the three children, and pay them their

1817.

DECOUCHE
v.
SAVETIER.

me que letous puisse monter, et en quelque endroit qu' ils soient situes; pour enjouir par le dit survivant en toute propriete et comme de chose lui appartenante, a compter du jour du deces du dit premier mourant.

Cette donation n'aura neanmoins point lieu, si au jour du deces du dit premier mourant, il y avoit des enfans existantes nes ou a naitre du dit mariage, mais s'il y en avoir et qu' ils vinssent, par la suite, a deceder, ou faire profession en religion, en minorite ou majorite, avant d'avoir valablement dispose, alors la dit donation, dont l'effet n'auroit ete que suspendue, reprendra la force et vertu, comme s'il n'eut jamais existe d'enfants du dit mariage."

respective portions, when they came of age or married. On the 28th of *March*, 1812, the said administratrix died, and her executors possessed themselves of the goods, &c. in her possession, and have been appointed guardians to her children.

That on the 30th of *March*, 1816, *M. F.* the real wife, died at *Lyons*, where she had continued to live with her mother, after her husband had abandoned her. She died intestate, leaving *M. A. S.* her mother, the plaintiff, living; who by the laws of *France*, and the legal effect of the said marriage contract, is entitled to *four sixteenths* of all the estate of the said *M. F.*, her daughter, at her death. The plaintiff *C. S.* is brother of the wife, and is entitled to *three sixteenths* of her property. *J. S.* (plaintiff) her brother, *M. B.* (plaintiff) her sister, *A. I. B.* the sister's husband, (plaintiff) and *P. B.* and *F. B.* children of a deceased sister, (plaintiffs) in right of their mother, are respectively entitled to *three sixteenths* each, of the estate of the said deceased *M. F.* &c.

That the defendants, who are executors and guardians as aforesaid, have possession of goods and money, and securities, which were in possession of the administratrix, and which belonged to her said husband, to the amount of thirty-five thousand dollars. That the eldest child of the administratrix, who was of age, had received no more than what was necessarily expended on his education.

The bill prayed that the defendants, as executors and guardians, may be compelled to account with the plaintiffs, for the property so in their possession.

The answer of the defendants, filed the 4th of *August*, 1817, admitted the facts charged in the bill. They stated that the husband made all his property, as a jeweller, while he lived with his assumed wife, in *New-York*. That she transacted all the mercantile business, as he could not read nor write, and was totally ignorant of the *English* language. That she was chiefly instrumental in the acquisition of the

property of which he died possessed, and considerably in-
creased it after his death; the inventory, in 1810, being
only 26,000 dollars, while that of 1812 was 35,000 dollars.
That the children by the assumed wife were treated by their
father as his legitimate offspring. And the defendants sub-
mitted to the court, whether the plaintiffs were not barred,
by the lapse of more than six years since the death of the
husband in 1810, without making any claim, as well as by
the lapse of time since the husband separated from his
wife; and if not, whether the *meritorious services* of the as-
.sumed wife to her husband, during his life, and to the
estate, since his death, do not entitle her and her children
to a share of the estate, as partner, agent, or servant.

The plaintiffs had offered to accept of a moiety of the
property, in satisfaction of their claim, which went to the
whole of the assets in the hands of the defendants; and all
the parties who were of legal age assented to the compro-
mise; but two of the defendants being infants, application
was made to the court for its sanction. The Chancellor,
on the 6th of *September*, 1817, ordered it to be referred to
a master, to examine and report whether the proposed com-
promise was for the interest of the infant children or not.

On the 14th of *October*, 1817, the master, (*J. I. Drake*,)
made a special report, in which he stated that the amount
of property left by *C. J. F.*, at his decease, was 26,307
dollars and 31 cents; and that the real wife died in a pub-
lic hospital, at *Lyons*, intestate; and that the plaintiffs, by
the laws of *France*, are entitled to her property, in the pro-
portions stated by the plaintiffs. But after examining
the marriage contract, and discussing the several questions
which arose on its construction and effect, he concluded
that the plaintiffs, as representatives of the wife, are en-
titled only to about 1,200 dollars, or 6,650 livres, under
the contract, and that, therefore, it would not be for the
interest of the infants to accept of the proposed compro-
mise. That even admitting that the wife, as widow

would have been entitled to the moiety of her husband's property, had she claimed it, yet she was not entitled to the property acquired, afterwards, by the mother of his children; nor, under these circumstances, to *interest ;* and he seemed to think that the statute of limitations was a bar to the claim of the plaintiffs ; and, on the whole, he concluded that it was not for the interest of the infants to accept the proposed compromise.

*Wheaton,* for the plaintiffs, contended, that they were entitled to all the personal property of which *C. J. F.* died possessed, and to all that had been added to it by the administratrix, since his death ; and consequently, that the proposed compromise, by which the one-half was relinquished in the defendants, was for the interest of the infant children.

The rights of the claimants, as heirs of *M. F.,* so far as they arise out of the marriage contract, must depend on the law of *France.* That contract was not only made in *France,* and with a general view to the law of that country, but the first article expressly stipulates that it shall be governed by the *custom of Paris,* although the parties should, afterwards, fix their domicil, or acquire property in countries where the laws and usages may be different, and which laws or usages the parties expressly renounce.

The *lex loci contractus* is, therefore, to be investigated. It is not a question of natural equity, but of positive institution. The rules of the common law of *England,* or those which have been adopted or established by our legislature, and the decisions of our courts, can afford no light on the subject. The court must determine the question as if it were sitting in *Paris.*

Though the *master,* in his report, seems to admit that the *lex loci contractus* is to govern, he has not deemed it necessary to ascertain what that law is.

It is not probable that the Royal Notaries of *Paris,* who

are a body of men distinguished for their learning, intelligence, and probity, would have drawn up a contract, containing stipulations so superfluous and contradictory, as the report suggests. The apparent discrepancy in the different articles, ought rather to be imputed to the difficulty of translating from one language to another, technical terms, which have no prototypes in our laws, institutions and manners. It is a principle of universal law, according to *Pothier*, (*Trait. des Oblig.* n. 92.) that in the interpretation of contracts, their terms ought to be construed in a sense which will give them effect, rather than in a sense in which they would have no effect.

The master is, mistaken in supposing that the *donation mutuelle*, in the last article of the contract, embraces only the property held *en communaute*, and amounting, in 1787, to about *one thousand livres*, and does not extend to the property held as *propre* to each of the contracting parties.

The stipulation of *propres*, (or *severalty*, as it is translated,) is not to be confounded with *substitution*, or perpetual entailment, to which it bears no analogy. Chancellor *D'Aguesseau*, in 1741, by an ordinance, which was submitted to all the parliaments of the kingdom, prescribed the mode of *entailing* property which was not to make part of the *communaute*, upon the *heirs*. This regulation would have been followed by the notaries who drew the contract, if that had been their intention. *Pothier*, (*Traite de la Communaute*, n. 105.) defines the term *propre*, when used in matters of *communaute*, as meaning that which is not *common*, or which does not enter *en communaute*.

But though the 1,500 livres advanced by the husband and wife, respectively, did not irrevocably enter into *la communaute*, as was the case with the 500 livres, advanced by each, yet by a *fiction* of law, the 3,000 livres were confounded with the *communaute*, so long as it subsisted, and the husband had the right of disposing of this sum, in his life time, *ad sustinenda onera matrimonii*. Those pro-

DECOUCHE
v.
SAVETIER.

*pres* are termed in the *French* law, *propres fictifs de com*, *munaute*, or *propres conventionelles;* and *Pothier*, in his treatise, (n. 325, 326.) shows the power of the husband over them.    The only effect, therefore, of this stipulation in the contract would have been, that on the decease of *C. J. F.* leaving lawful children, as heirs (*de ligne*) they would have taken 1,500 livres from the amount of the entire *communaute*, before the distribution of the general mass; and his widow would also have taken an equal sum.    As he left no lawful children living at the time of his death, the clause of *donation mutuelle* was brought into operation, the effect of which is to give to the survivor, all the property possessed by the party dying, at the time of his decease.    Had there been no such clause, the *propres* would have been extracted from the *communaute*, before any partition, and would have descended to the heirs lineal and collateral (*aux leurs de cote et ligne,*) of the respective parties.    (*Pothier, Trait. de la Comm.* n. 329.)

The contract provides that the restitution of the *propres*, (*le remploi des propres,*) if any shall be aliened during the marriage, shall be made according to the custom, and the party who is entitled thereto, or his or her heirs, shall have a remedy in the nature of a real action.    (*Vide Pothier, Trait. de la Comm.* n. 585.)

The *donation mutuelle*, then, clearly includes the 3,000 livres of *propres fictifs de la communaute;* and expressly all the property, (*meubles, et immeubles, acquetes, conquetes, propres et autres,*) which either party might possess, at his or her decease, whatever might be the value, or wherever situated.

The *propres* are included in the donation *nominatim;* and the import of this term, as well as the words of this stipulation, are explained by *Pothier*, with his usual precision and perspicuity.    (*Trait. de la Comm.* n. 226. n. 340.)

There is, then, no discrepancy between this stipulation and the subsequent *donation mutuelle ;* and, as the children of the marriage are dead, both clauses may have their full operation and effect.

To see what part of the property, belonging to the husband at the time of his death, the wife is entitled to, under the *communaute,* connected with the *donation,* we must inquire what, by the Custom of *Paris,* was the nature and extent of the *communaute.*

According to *Pothier,* this *communaute* includes all the property of the parties existing at the death of the party first dying, *except as excepted by the custom or the contract.* (*Ibid.* n. 168.) The property of which the husband, in this case, died possessed, in 1810, is included in the *communaute* by the custom, and is not excluded by the contract. That property did not come to him by *succession, donation or legacy ;* but was the fruit of his commercial industry, exercised upon the personal property which formed the capital of the *communaute,* (properly so called,) and the *propres fictifs de communaute.* It is settled, that the interest and profits of the *propres,* (*les fruits des propres,*) acquired during the marriage, enter into, and make part of the *communaute,* even though the parties, after putting a specific sum into *communaute,* reserve the residue as *propre,* and also what may be acquired by *succession* or *otherwise.* (*Pothier, ibid.* n. 204.)

In the present case, there being no children of the marriage surviving, both the *propres* and the *communaute* (strictly so called,) and all the *fruits and profits* thereof, are absorbed in the universal and irrevocable *donation* between the parties, with which the contract concludes.

The word "*autrement,*" is not to be extended, so as to destroy the effect of the stipulation as to the *propres.* It meant only to refer to such property as should be acquired by a title of the same class with those specified, such

**1817.**

DECOUCHE
v.
SAVETIER.

as *succession, legacy, donation,* or some other lucrative title. (*Pothier, ibid.* n. 323. n. 324.)

The condition, then, on which the term *propres* had an ephemeral existence, having been satisfied, and as the property left by the husband did not come to him by *succession, legacy, donation,* or *any other similar title,* but consisted of the original capital of the *communaute,* (literally so called,) and the *propres fictifs de communaute,* and the fruits of his industry exercised on that capital, the whole must be included in the general *donation mutuelle.*

*Donations par contrat de mariage* are regarded with great favour and benignity in the *French* law. They are valid without any actual delivery of the things, and extend to future acquisitions, as well as to property then in possession and are irrevocable during the coverture; and all the property possessed by either party at his or her decease, may be delivered to the survivor, without ceremony. (*Lauriere, sur le Coutume de Paris,* tom. 2. p. 330. *Code Civil,* art. 1082, 1083. 1086, 1087.)

Our statute of distributions has nothing to do with this case. The law of the country where the wife was domiciled at her decease, must govern the inheritance of the *personal* property to which she was entitled, on the death of her husband. *Huberus Prælect.* tom. 2. *l.* 1. tit. 3. *De conflictu legum,* § 9. p. 540.) (*a.*)

The plaintiffs claim as heirs of *M. F. ab intestato,* according to the laws of inheritance in *France.* The defendants claim as legatees under the will of the pretended *M. F.,* who having no rights over the property herself, could impart none to others. *Personal* property follows the law of the place where *the intestate is domiciled,* in whatever place that property may happen to be situated. (*Huber Prælect.* tom. 1. 278. *l.* 3. tit. 13. *de succes. ab intest.*

(*a*) "*Nont antum ipsi contractus ipsæ que nuptiæ certis locis rite celebratæ ubique pro justis et validis habentur, sed etiam jura et effecta contractuum nuptiarumque in iis locis recepta, ubique vim suam obtinebunt.*"

*collat.* (*a.*) This is the established doctrine of law recognized in the courts of all countries. The collateral heirs of *C. J. F.* have "no part or lot in this matter." They knew, that by the laws of their own country, they could assert no claim to what their ancestor had irrevocably conveyed to another, in 1787. They have not, therefore, appeared as parties; and having no interest in the subject of controversy, it was not necessary to make them parties to this suit.

Having shown that the plaintiffs are legally entitled to all the propety left by *C. J. F.* at his decease, it will be no less easy to show that they are, also, entitled to all the additions made to that property since his decease. The authorities on this subject are equally clear and explicit; that the heir who has established his right to the succession, has a right to demand of the person who has obtained possession of the estate, on the death of the intestate, not only the property, as it existed at his decease, but every thing which it has produced since, or which in any manner appertains to it. (*Dig.* lib. 5. tit. 3. 1. 29. s. 3. (*b*) *Pothier, Trait. du Droit de Propriete,* n. 400, n. 401, *Haber. Prœlect.* tom. 2. 755. lib. 5. tit. 3. *de Hœred. petit.* s. 14. *Pothier, Pandect. Just.* in *Nov. Ord. Digest.* tom. 1. p. 186.)

Whether the possession of the defendants is *bona fide* or *mala fide,* can make no difference as to their obligation to restore every thing belonging to the succession claimed

(*a*) " *Sæpe fit ut diversum jus succedendi ab intestato in locis, ubi defunctus habuit domicilium, atque in iis locis, ubi bona sita sunt, obtineat, dubitatur secundum utrius loci leges successio regenda sit. Communis et recta sententia est, in rebus immobilibus servandum esse jus loci, ubi bona sunt sita; quia cum partem ejusdem territorii faciunt, diversæ jurisdictionis legibus adfici non possunt; verum in mobilibus nihil esse causæ, aliud quam jus domicilii sequamur; quia res mobiles non habent affectionem versus territorium, sed ad personam patris familias duntaxat; qui aliud quam quod in loco domicilii obtinebat, voluisse videri non potest.*"

(*b*) "*Non solum ea quæ mortis tempore fuerunt, sed etsi quæ [postea augments nare ditati accesserunt, venire in hæreditatis petitionem.*"

1817.

DECOUCHE
v.
SAVETIER.

by the plaintiffs, as the legal heirs. (*Pothier. ibid.* n. 426.) The most favourable character in which they can be viewed, is that of a *negotiorum gestor*, in which character, perhaps, they would be entited to compensation out of the profits made of the property of the intestate.

Another objection has been stated by the master. It is alleged that the statute of limitations of this state is a bar, at law and in equity, to the assertion of the rights of the plaintiffs. It cannot be denied, that the recovery must be sought, and the *remedy* pursued, according to the *lex fori.* (*Nash* v. *Tupper*, 1 *Caines' Rep.* 402. *Ruggles* v. *Keeler*, 3 *Johns. Rep.* 263.) But if it had not been so determined by the Supreme Court, in the cases cited, it might have been contended, that a statute of limitations did not fall within this rule, but is as much a discharge of the contract as an insolvent or bankrupt act, and, therefore, was to be applied according to the *lex loci contractus.* One of the learned Judges of the Supreme Court of the *United States*, seemed to incline to that opinion, in the case of *Reimsdyk* v. *Kane*, (1 *Gallis. Rep.* 371. 376. per *Story*, J.) decided in the Circuit Court of the *United States*; and he grounded himself on the authority of *Casa Regis.* (*Decis.* 130. s. 33. *Decis.* 179. (*a*)

By the *French* law, the claim of the plaintiffs would only be barred by the longest prescription, which is *thirty* years. (*Lauriere sur la Coutume de Paris*, tom. 1. 374, 375. *Code Civil,* art. 789—2262—2281.)

The parties by their contract in this case, stipulate to be bound by the law of *France*, wherever their domicil or property may be. Even *Huberus*, who originated the distinction between the *lex fori*, and the *lex loci contractus*, and says, that the former is to control as to real property, admits, that in case of a marriage contract, the latter may prevail even as to real property situated in other countries.

(*a*) " *Ratio est, quia statutum imtelligit semper disponere de contractibus factis intra et non extra territorium suum.*"

(*Hub. Prælect.* tom. 2. p. 540. l. 1. tit. 3. sec. 7. p. 541. sec. 9.) And he considers the plea of prescription as annulling and discharging the contract. *"Debitum ex vi legis abolitum."* (*Ib.* p. 1477. l. 44. s. 2. tit. 3.) *Pothier,* also, in his treatise of *Prescriptions,* after stating the general rule, that the *lex loci rei sitæ* is to be applied to prescriptions as to *real* property, says, that *moveable* property is governed by the law which governs the person of the owner, that is, by the law of the place where he is domiciled. (*Trait. de la Prescription,* part 2. art. 5. n. 251.)

Again; the marriage contract is a specialty, being under a notarial seal; and though the present action arises *incidentally* on this contract, yet it has the same time as the *principal* action on the sealed instrument. (*Cole* v. *Saxby,* 3 *Esp. N. P. Rep.* 160. per Lord *Kenyon.*)

This is in the nature of a writ *de rationabili parte bonorum* at the common law, or of the *petitio hereditatis* of the civil law, the former of which is not bound by the statute of limitations, (*Hutton,* 109.) nor the latter by the *prescriptio longi temporis.* (*Code,* lib. 1. tit. 3. s. 7.)

*Sampson,* contra. The Master has reported against the proposed compromise being for the interest of the infants, on two grounds : 1. That neither *M. S.,* nor her legal representatives, is entitled to any part of the proper or separate estate of *C. J. F.,* deceased ;

2. That if they were so entitled, their right has become barred by lapse of time.

The plaintiffs supposed that the Master had mistaken the import of the marriage contract; and they obtained the opinion of an eminent *French* jurist (Count *Real*) in support of their own conclusions against that of the Master. They express great surprise that the Master should have so misconceived the meaning of the contract, and suppose it to be owing to an inexact translation. But when it is considered that the learned and logical *Pothier*

has written two volumes to explain *la communaute* to his countrymen, in their own language, it is not surprising that a stranger to the language and laws of *France* should find some difficulty in understanding the terms of the contract. It is said, that the word "*propres,*" when used in relation to *communaute,* has a meaning widely different from its ordinary acceptation; and that "acquets," and "conquets," which, on all occasions, are regarded as *synonymous,* are here used in direct opposition. It would be equally, if not more difficult, for the most learned and able *French* lawer to understand an *English marriage settlement,* and all the corollaries, from the rule in *Shelly's case.*

It is unnecessary to attempt any explanation of the various terms used in this contract. They are all fully commented on by *Pothier,* and all their modifications, and the various exceptions and derogations, are stated by him in his treatise *de la communaute.*

The Master conceives that the two principal clauses, the one called the stipulation or reservation *de propres,* and the other the *donation mutuelle,* are repugnant to each other, and that the latter should be, therefore, rejected, on the principle that the first clause in a deed is to prevail, and this last clause giving what is already disposed of, is nugatory.

After mentioning how much shall enter into the partnership, (*la communaute*) the stipulation is, that "the residue, with whatever may accrue to the parties by *succession, gift, legacy, or otherwise,* shall be in severalty to that party to whom the same shall come and belong, and to the representatives of that person exclusively."

It is agreed that this is not a donation, but a reservation, which gives to moveable property the quality of real; a quality, however, ephemeral, and to last no longer than until the event happens, for which it is meant to provide, when it ceases to be *real fictif* or *propre.* It is, no doubt, a clause inserted for the benefit of the children of the

marriage, and to prevent the parents of the opposite line from succeeding to any part, until a failure of all the children of the marriage; so that they first succeed to each other, and the last child is to have the whole, and the surviving parent nothing; because, in having the quality of real property which never *ascends*, and extended by the term *aux leurs*, the children would all, in succession, have the benefit of it. But when the last child dies, the rule of *paterna paternis, materna maternis*, ceases; and the property again becoming moveable, no longer follows the artificial direction, but the surviving parent succeeds to it, as the property of his child.

But, then, what is to be the effect of the additional terms *de cote et ligne*, unless it be, that the property shall go to collaterals, in failure of children of the marriage, and not to the opposite line? It is, indeed, not easy for an untutored mind to comprehend, how so plain a clause should be of so little avail, that a subsequent clause, without a new consideration should abrogate it. The authority of *Pothier*, himself, (*de la Communaute*, n. 329.) which has been cited, shows, that had it not been for the subsequent clause of *donation mutuelle*, the same property that is to go to the survivor, would have descended to the heirs, lineal and collateral, of the respective parties, under the general description, *aux leurs de cote et ligne*, excluding from the paternal *propres* the maternal line, and *vice versa*.

Is not, then, the clause of *donation mutuelle* repugnant to the first stipulation, which reserved this property, so excepted from the *communaute*, to the side and line, *paterna paternis, materna maternis*?

The counsel for the defendants cannot but feel great diffidence in urging conclusions, so different from those of the learned counsel for the plaintiffs, and of the eminent jurists he has invoked to his aid. But aside from the legal subtleties of the *French* jurisprudence, the conclusion of

1817.

DECOUCHE
v.
SAVETIER.

the Master would appear quite satisfactory and just to a person of common sense or of ordinary understanding.

It is said, that the construction given by the Master would make the reservation an *entail*, without any of the forms prescribed by the ordinance of Chancellor *D'Agues-seau*. But the reservation would not amount to a *substitution*, if a substitution be, as it is called, an entail; for, according to *Pothier*, the quality of *realisation* would cease as soon as the property vested in the first collateral, as it would, if a simple stipulation of *propre*, have ceased upon the first partition between the children and surviving parent; or, if *aux siens*, when the last child should have succeeded, and died without issue, and without making any disposition of it.

Again; the Master thinks that as all the property *C. J. F.* left must have come to him alone and individually, being so long separated from his wife; and that as it did not come to him by *succession*, *donation*, or *legacy*, it must have come " *otherwise*" ; and, if so, it was, by the stipulation, his own *propre fictif real*, by virtue of the term " otherwise."

But *Pothier* is again cited to show that the word " *autrement*," upon which this question mainly turns, has, in this stipulation, a restricted, or, as it is called, a categorical sense; and applies only to such objects as are in a similar predicament with those expressed, namely, *succession*, *donation*, *legacy*. There is clearly no mistake in the translation of the word *autrement*. The plain *English* is " otherwise;" and to so plain a word the Master has given the obvious meaning, that is, what should come in all other ways, or, in any other way or manner.

If the Master has mistaken this matter, it is no discredit to his judgment, for he is not the first who has conceived that this clause was to have the effect of a *substitution*, assuring to the family of the stipulating party all the

moveable property which came from that line. (See *Po-* **1817.**
*thier, ibid.* n. 339. n. 352.)

It must be owned, we think, that the meaning given to DECOUCHE
the word " autrement," savours much of refinement ; but SAVETIER.
v.
as the whole of this clause is discussed by *Pothier*, it is only
necessary to refer again to that writer, and leave the ques-
tion to the better judgment of the court.

Next, as to the bar of prescription by the statute of limi-
tations or lapse of time. Our statute, (1 *N. R. L.* 184.)
has no saving clause for plaintiffs beyond seas. The plain-
tiffs' counsel reluctantly admits that it has been decided
by the Supreme Court, in the cases which he cites, that
the statute of limitations, which is the *lex fori*, is to be
the measure of the time of prescription. This is suffici-
ent here. To go further would be a useless waste of time
and of learned research.

But, it is said, that this contract is a specialty, or in na-
ture of a specialty, and is, therefore, barred or not prescri-
bed by legal presumption, in less than twenty years. The
authority for this argument is no more than an *intimation* of
Lord *Kenyon*, an *obiter dictum* of that judge, at circuit ;
and the case before him is very unlike the present.

The argument derived from analogy to the writ *de ra-
tionabili parte bonorum* is still more feeble. That was a
writ *by the custom of certain counties ;* and the custom
of the county served for it, as in the case cited, the county
of *Nottingham.* The reasons of the judgment in that
case was special ; namely, that it was an original writ
not found in the *register,* and not mentioned in the statute,
as one of the actions to be barred by *six years ;* for though
the plea was *non detinet,* the action was not detinue ; and
in this case, the true test is to be found whether this con-
tract is a specialty, namely, whether it would be declared
on as such. (*Hutt.* 169.)

It is not denied, for the point is settled by the case of
*Bond* v. *Hopkins,* (1 *Sch.* and *Lef. Rep.* 429.) that if the

equitable title is not sued for, within the term that would bar a legal title of the same nature, the court of equity will not relieve ; or, in other words, that the bar at law, is a bar in equity.

The plaintiffs' claim, if any thing, is for a distributive share ; and the statute of distributions, (1 *N. R. L.* 313.) gives the remedy by *debt, detinue,* or account, as the case may require.

The counsel then proceeded to cite and comment on the various authorities to be found in the books, as to limitations or prescriptions, particularly in relation to trusts and frauds : *Smith* v. *Clay, Ambler,* 647. *S. C.* 3 *Bro. Ch.* 639. notes. *Lacon* v. *Briggs,* 3 *Atk.* 107. 3 *Freeman* 55. 2 *Eq. Abr.* 578. 10 *Vesey,* 93. *S. C.* 2 *Maddock's Ch.* 241. 1 *Mitford Pl.* 213. 1 *Ch. Cas.* 102. 1 *Sch.* and *Lef.* 109. 1 *Salk.* 154. in notes. *Gilb. Eq. Rep.* 228, 229. *Collins* v. *Goodhall.* 2 *Vern.* 235. *Vin. Abr.* Limitations *T.* note. *Levellier* v. *Mackworth, S. C. Eq. Cas. Abr.* 589. pl. 8. *Parker* v. *Ash,* 1 *Vernon,* 257. *Smallman* v. *Lord,* 2 *Atk.* 71. *Townsend* v. *Townsend,* 1 *Bro. C. C.* 554. *Beckford* v. *Wade,* 17 *Vesey,* 87. 10 *Mod.* 206. 1 *Madd. Ch.* 79. 441. 2 *Madd. Ch.* 84. 113, 114.)

There was no fraud in the conduct of the administratrix, the mother of these children, for when she joined her destiny to that of their father, she may have supposed him unmarried. Fraud is attended with concealment ; and an intent to cheat is of its essence. Had *C. J. F.* been wealthy, and she, knowing him to be a husband and a father, had formed the design to rob his children of their inheritance, it would have been a gross fraud. But she found him poor, and by her faithful industry and good management, she made him rich. Under the peculiar circumstances of the case, every presumption ought to be indulged in favour of her innocence.

Admitting that time does not bar a direct *trust,* as between the trustee and the *cestui que trust,* yet the cases

cited show that where a party has slept on his rights so long as to manifest an acquiescence, a court of equity will be passive, and will not lend its aid to afford him relief. A court of equity, independent of the statute, has its own rules, as to rejecting stale demands, and discouraging *laches* and neglect.

THE CHANCELLOR. This is an amicable suit for the purpose of settling, under the authority and sanction of this court, the controversy subsisting between the parties.

The facts upon which the plaintiffs rest their claim and the defendants their defence, are not in dispute. They are disclosed and admitted by the pleadings. A proposition was made by the plaintiffs for a settlement, upon terms deemed honourable and beneficial to the parties. The claim went to the whole of the assets which came to the possession and were in the hands of the defendants, as executors, and the proposition was to accept of a moiety of this property in satisfaction of the claim. All the parties who were competent to give their assent, agreed to the proposition. But as two of the defendants were infants, the sanction of the court was requested, and an order of reference was accordingly made to a master, to examine and report, whether, in his opinion, the terms of the proposed compromise were for the interest of the infants.

The Master has reported, that it would not be for the interest of the infants to accept of the terms, and he has assigned his reasons at large. In his opinion, the claim of the plaintiffs to the whole, or even to a moiety of the property in question, could not be sustained, if the cause was brought to a hearing.

The parties have again submitted the case upon the pleadings, and the master's report; and their counsel have argued the claim upon the merits extremely well. The question is still, whether the demand has such foundation

1817.

DECOUCHE
v.
SAVETIER.

and extent, as to render the acceptance of the terms advisable?

The plaintiffs are the lawful representatives, under the French law, of *M. S.*, the true and lawful wife of *C. J. F.* She died in *France*, in 1816, a widow and intestate, and the law of that country governs the inheritance of the personal property to which she was entitled at the time of her death. It is a settled principle, that the descent of personal property, wherever situated, must be taken from the country of the intestate's domicil. *Mobilia personam sequuntur, immobilia situm.* (*Hub. Prœlec.* tom. 1. 278. lib. 3. *de Success. ab. Int. Collat. Bempde* v. *Johnstone,* 3 *Vesey,* 198. *Somerville* v. *Somerville,* 5 *Vesey,* 750. *Bruce* v. *Bruce,* 2 *B. & Puller,* 229. note. *Desesbats* v. *Berquier,* 1 *Binney,* 336.) There can be no doubt, then, that the plaintiffs are entitled to all the right to the personal property of *C. J. F.*, deceased, which existed in his widow, at her death.

Her representatives claim the whole of his personal property, by virtue of the marriage contract of 1787. If that marriage contract was out of the question, or could be waived, the plaintiffs would be entitled, under our statute of distributions, to a moiety of the personal estate of *F.*, inasmuch as he died intestate, without lawful issue.

The claim, to a certain extent at least, under the marriage contract, or the claim under the statute of distributions, must prevail, unless barred by the statute of limitations.

I shall consider the claim, in all these points of view; and though I shall be obliged to differ from the Master, in the construction of the marriage contract, as well as on other points in the cause, it is no more than justice to him to declare, that I have perused his report with much respect. It affords evidence of the ability, diligence, and zeal, with which he discharged his duty.

1. The marriage contract was executed with the requisite formalities, and was, doubtless, valid by the laws of

*France.* It declared that the *Custom of Paris should go-vern the disposition of the property of the parties, though they should thereafter settle in countries where the laws and usages were different or contrary.* The construction of the contract was thus made to depend upon the *lex loci contrac-tus ;* and without this provision in the contract itself, there would be no doubt of the general principle, that the rights dependent upon nuptial contracts, are to be determined by the *lex loci.* (*Hub. de Conflict. Legum,* Lib. 3. § 9.)

The contract is set forth, at large, in the bill, and contains three important stipulations : 1. The general declaration that there should be a community of property between the parties, according to the Custom of *Paris :* 2. The special exception as to part of the property, brought into common stock, and which exception declares, that of the goods of the parties, (4,000 livres,) there shall be placed in common, by each party, five hundred livres, and the residue, with whatever else shall be acquired thereafter, by succession, gift, legacy, or otherwise, shall be in severalty, to that person to whom the same shall come or belong, and the respective representatives of that person, exclusively, in the line of representation of the person to whom the same shall come : 3. A general donation to the survivor, in case either should die, without issue living. The parties mutually give, in the most available manner, to each other, and to the survivor, which is in like manner mutually accepted, all the estate and property, moveable and immoveable, acquired or purchased, to them in any ways belonging, and which shall belong, in any way or manner, to that party who shall first die, and from the day of the decease of such party, and of whatever amount the same may be, and wherever situated, to be enjoyed by the survivor as his or her several property exclusively, from the day of the decease of the party who shall first die. The donation was not to take place, if, at the day of the decease of the party first dying, there should be chil

dren then living, born of the marriage, but if, neverthe-
less, there should have been children; who afterwards
should have died, or entered into religious profession be
fore they had made a valid disposition of their rights,
then the donation, of which the effect would have been
thus suspended, will resume its force as though there had
never been any children of the marriage.

*French* contract of marriage.

Notwithstanding the general declaration in the first part
of the contract, that there should be a community of goods
between the parties, according to the Custom of *Paris ;* yet
immediately after, there is a provision, that out of the
4,000 livres mutually and equally advanced, there should
be, by each party, 500 livres placed *en communaute,* and the
*residue* should remain *propre,* according to the second stipu-
lation which I have noted.

To a person unacquainted with the provisions and terms
of the *French* law, it would appear that the first clause
was, in a great degree, repealed by the second. By the
one, their goods were to be common, and by the other,
only one fourth part were to enter into community. But
the contradiction is only apparent, and the subsequent
intermediate stipulations in the contract, form only a
branch of this same peculiar *societe de biens qu' un homme
et une femme contractent lorsqu' ils se marient.* They may
be considered as appurtenant to the ordinary convention
of the community, according to the Custom of *Paris ;* and
their object was to withdraw a portion of the property
from its destiny under the community, in order to make
a certain provision, in the event of either party dying
leaving children of the marriage. But the death of the
husband, without lawful issue, rendered the special stipu-
lations inapplicable and useless. There is to be no sub-
tractions or deductions and divisions of property in this
case, seeing that no issue survived.

The term *propre,* when used in relation to matters in
community, has a different meaning from that applied to it.

*Margin:* 1817. DECOUCHE v. SAVETIER.

when used in other matters of law. It is used for the separate property of the parties respectively, as contradistinguished from that which is placed in community, strictly so called. Parties often stipulate, in their contract of marriage, under the community system, that the residue of their property shall be separate. (*Le surplus de leur biens seront propre.*) If it be personal property or moveables, it is called *propres conventionnels*, or *propres fictifs;* and the husband may alienate that property, during the coverture; it is in many respects, confounded with the other goods, strictly in community, and may be applied *ad sustinenda onera matrimonii.* (*Pothier, Traite de la Communaute,* n. 105. 316—326. *Argou, Inst.* tom. 2. p. 77 —84.)

The 3,000 livres were to remain, in this case, separate or *propre.* If alienated, they were to be replaced *pursuant to custom.* This stipulation in the contract, in respect to the restitution on the death of the husband, of the price of that kind of property alienated during the coverture, is well known, and appears, like the other special stipulations in this contract, to be almost a *formula* in the nuptial contracts creating the *communaute de biens.*

But there appears to me, (and which arises, no doubt, from the imperfect knowledge which I have on this subject,) to be still a contrariety between that part of the contract which declares that the *propres conventionnels,* or *le surplus* should go *aux leur de cote et ligne,* and the mutual donation (*donation mutuelle*) at the conclusion, which gives all the property of the parties (*tous les biens, meubles et immeubles, acquetes, conquetes, propres, et autres*) at the death of either, to the survivor, in default of children living. I should have supposed, from the explanation given in the books, of the terms, *de cote et ligne,* that the *collateral heirs* of the children dying without issue, and of the side and line of the parent first dying, would have taken that separate property, or *propres fictifs de la commu-*

*Donation mutuelle.*

*naute.* So I read *Pothier* and *Argou.* (*Traite de la Com.* No. 329. *Inst. au Droit Fran.* tom. 2. p. 78.—82.) The *donation mutuelle* is, however, to operate upon all the property, wherever situated, of which the party may die possessed, and the survivor takes it all, except in the single case of children living, or who may have disposed of the same. This sweeping clause is explicit and peremptory, and certainly controuls the descent of the property to the collateral heirs of the children.

These donations frequently enter into the contract of marriage, and the parties can give to each other whatever property they shall possess at their decease; the *French* law recognizes such donations, and holds them valid and irrevocable, without being accompanied with delivery or possession. (*Argou,* liv. 3. ch. 14. *des donat. fait. par contrat de mariage. Pothier Trait des donat. entre vifs,* sec. 2. art. 4. *Code Civil,* No. 1082, 1083. 1087.)

This donation was in full operation at the death of the husband, in 1810; and the *casus fœderis* occurred, for he died without issue living of the marriage. His wife, as survivor, took all his personal property, under the donation, which embraced not only the property which originally entered into community, but that which was kept separate as *propres conventionncls.* It was a stipulation, as we have seen, which the parties were not only competent to make, but which seems to be familiar to the *French* law. The original fund which constituted the *communaute,* and the *propres fictifs* which were kept separate, formed, aggregately, the capital from which all the subsequent property was produced by the industry of the husband. The joint increase entered into the common stock of the *communaute,* by the general rule; and had it not been so, this increase would have been reached by the universality of the donation.

I conclude, that the plaintiffs are entitled, on the true construction and operation of the marriage contract, to all

the personal property belonging to *C. J. F.* when he died. But I give this opinion, with distrust and diffidence, owing to a very imperfect acquaintance with the *French* law, and more especially, with this curious and complicated branch of it; and I should not have hazarded any remarks on the subject, if I had not felt myself urged by duty. Nor will it be improper to mention here, that an opinion of Count *Real* on this very marriage contract, has, by the arrangement of the council, been submitted to my inspection; and his able explanation of the *French* law, I have found supported by the authorities referred to, and it has much increased my confidence in the conclusion which has been drawn.

With respect to the nett produce, or increase of that property, *since the death* of the intestate, the plaintiffs are entitled to it, also, after the reasonable charges are deducted. It was property held in trust for the widow, and for their benefit, as the legitimate *cestuy que trusts.* This appears, also, to be the general doctrine in the books. *Dig.* 5. 3. 20. 3. *Pothier, Traite du Droit de Propriete,* n. 400—406. *Hub. Prælec* lib. 5. tit. 3. *de Hered. Pet.* §. 14.)

If the plaintiffs are entitled, under the marriage contract, as representatives of the surviving widow, to all the personal estate left by *C. J. F.,* they are not barred from asserting the claim, by lapse of time.

2. The person, under the name of *M. F.,* to whom letters of administration on his estate were granted, in *June,* 1810, succeeded to the possession of the property, not in her own right, but expressly as *trustee* for the party having right. That party was, in this case, the true and lawful widow of *C. J. F.* under the marriage contract, or that widow and the next of kin, under our statute of distributions. She took the property into her hands as *administratrix.* This was a direct and express trust, and she could not have set up the statute of limitations, as a bar to the widow

1817.                and next of kin.   It would be unjust for the person who
                     takes possession of the property of the intestate, under
DECOUCHE            the authority of law, *qua* administratrix, to be at liberty,
   v.
SAVETIER.            after six years' possession, to set up the statute of limita-
                     tions, as a bar to the *cestuy que trusts*.   All the cases admit,

No lapse of    that no time bars a direct trust, as between trustee and ces-
time is a bar to
a direct trust, *tuy que trust*.   The settled rule is, (and so it was recently
as between the
*trustee and ces-* declared by the Master of the Rolls, in *Cholmondeley* v.
*tuy que trust.*     *Clinton*, 2 *Merivale*, 360.) that so long as a trust subsists,
                     the right of a *cestuy que trust* cannot be barred by the
                     length of time during which he has been out of posses-
                     sion, and that he can only be barred, by barring and ex-
                     cluding the estate of the trustee.   This general rule ap-
                     plies to this case, for an administrator is a trustee for
                     the party entitled by law.   His very office is a trust, and
                     he can take in no other capacity.   Lord *Hardwicke* said,
                     (2 *Vesey*, 482.) that executors and administrators were, to
                     many purposes, considered in Chancery, as Trustees.

But where a        There is a class of cases which admit a reasonable time
person takes
possession    of to be a bar, but these are cases in which a party is turned
property in his
own right, and into a trustee, by matter of evidence merely, and who
is, afterwards,
by   matter   of took possession originally in his own right, and was, *prima*
evidence
construction, or *facie*, the owner.   Thus in *Bonny* v. *Ridgard*, (cited in 4
changed into a
trustee,   lapse *Bro.* 130. 138. and in 17 *Vesey*, 97.) the fraudulent pur-
of time may be chaser of a leasehold estate from an executor, was not
pleaded in bar.
                     permitted by Lord *Kenyon*, to be turned into a trustee for
                     the children of the testator, in consequence of the great
                     lapse of time between the purchase and the filing of the
                     bill.   So, in the cases of *Andrew* v. *Wrigley*, and *Beckford*
                     v. *Wade*, (4 *Bro.* 125. 17 *Vesey*, 87.)   the suits were
                     brought to disturb purchasers, on the ground of fraud, and
                     to turn them into trustees, by construction; and the court
                     held, that in these cases of a possible, eventual trust, de-
                     pending upon proof, length of possession was, and ought
                     to be, a bar, upon the principle of the statutes of limita-
                     tions.   But these cases have no relation to suits against

the very executor or administrator, by the next of kin, or other person entitled to the distribution of the assets. The executor, though he may plead the statute, as against a creditor, (*Webster* v. *Webster*, 10 *Vesey*, 93.) can never plead the statute of limitations as a bar to a legacy. (*Vide* the cases in 1 *Johns. Ch. Rep.* 316.) Where even a trust estate is created by will to pay debts, such a trust is held not to be within the statute of limitations. (*Norton* v. *Turvill*, 2 *P. Wms.* 145.) The true ground of the equitable jurisdiction over executors and administrators, in compelling the payment of legacies and distributive shares, is, that they are trustees for those purposes. This is the declared doctrine in *Farrington* v. *Knightly*, and *Wind* v. *Jekyl*. (1 *P. Wms.* 249. 572.) The statute of distributions, say the books, was intended as the will of the intestate, and the succession to personal estate is as much fixed as the title of the heir to the real estate at common law; and on the ground of the trust in the administrator, chancery assumed the power of compelling distribution as soon as the statute was passed. (*Winchelsea* v. *Norcloffe*, 2 *Rep. in Ch.* 367. *Matthews* v. *Newby*, 1 *Vern.* 133.)

*An executor cannot plead the statute of limitation in bar to a legacy; though he may against a creditor.*

*An administrator, being trustee, cannot set up the statute of limitation in bar of the next of kin, or the persons entitled to the distribution of assets.*

I am not prepared to say that the statute of limitations might not be set up by the persons to whom the administratrix bequeathed the trust property, provided sufficient time had elapsed after her executors or legatees had succeeded to the possession. There may perhaps be a sufficient analogy between such a case, and that of the purchasers under the executors in the cases to which I have referred. I mean only to declare, that no time is to be computed against the plaintiffs, while the administratrix had posession of the property; and the subsequent time falls short of any legal bar.

It will be observed, that I have considered the question of time as governed by our own law, and that the limitation of suits was to be taken from the *lex fori*, and not from the *lex loci contractus*.

*The time of limitation of actions is governed by the lex fori, not by the lex loci contractus.*

the *lex loci contractus.* The counsel for the plaintiffs con-tended that the *French* law of prescription ought to govern in this case ; (which was stated to give a period of thirty years,) and he called my attention to a doubbt upon the question, raised in the case of *Van Reimsdyk* v. *Kane,* (1 *Gallis. Rep.* 371.) in which the inclination of the Court appeared to be in favour of the foreign pre-scription in cases between foreigners, and it was consi-dered as an important question open for consideration.

The respect which I feel for every opinion of the learned Judge who gave that intimation, induces me to pause for a moment upon the point.

It is not for me to say, whether this can, or cannot be an open question in Courts of the *United States ;* but it is sufficient for my direction, that the rule is settled in this state, by the judgment of the Supreme Court, in *Ruggles* v. *Keeler.*    (3 *Johns. Rep.* 263.)    That decision, as it appears to me, is not only well supported by authority, but is founded on principles of public convenience and po-licy, which have met with a very general assent and re-ception.    Our statute of limitations contains no excep-tion, in form, of foreigners or of foreign contracts, but is general and peremptory in its terms.    And why should our Courts be disturbed by the litigation of stale de-mands of foreigners, grown difficult and obscure by time, when an action upon such demands is denied to our own citizens, by the wise policy of the law?    It is a question of municipal convenience and public utility, which every government has not only a right to consult, but is bound in duty to promote.    The plea of the statute of limitations does not touch the merits of the contract.    It merely bars the remedy, in the particular domestic *forum,* and does not conclude the plaintiff in his own, or in any other foreign country.    To render the matter of the judgment a *res judicata,* it is necessary that the grounds of the judgment should be the same.    ( *Graham* v. *Maxwell,* 2 *Dow.* 314.)

The reason of the *exceptio rei judicata*, is to prevent endless litigation and discordant decisions; (*Dig.* 44. 2. 6.) the reason has no application to such a plea. The statute of limitations has reference to the *ordinatio*, not to the *decisio litis;* and, therefore, to use the language of the Civilians, *servanda est consuetudo loci ubi causa agitur.*

In the provinces of the *Netherlands,* the local limitation where the action is brought, prevails; and *Huberus* (*De conflictu Legum*, § 7.) cites two adjudged cases to that effect, prior to the year 1680. He considers the rule of prescription as affecting the remedy, and not the merits of the case. *Ratio hæc est, quod præscriptio et executio non pertinent ad valorem contractus, sed ad tempus et modum actionis instituendæ.* The Supreme Court of *Massachusetts,* in *Pearsall* v. *Dwight,* (2 *Tyng,* 84.) adopted the rule, for the same reason; and that decision ought to be regarded as authority, for it was the unanimous opinion of the court, delivered by by the late Ch. J. *Parsons,* whose vigorous mind was richly endowed with various learning, and who possessed that quick discernment and deep knowledge of legal principles that justly rendered him the ornament and pride of his country.

There can be no doubt that the same rule is considered as the settled doctrine in the courts at *Westminster Hall.* Thus, in *Dupleix* v. *De Roven,* (2 *Vern,* 540.) the parties were *Frenchmen,* and the debt was contracted in *France,* and yet the Lord Keeper made no scruples of allowing a plea of the *English* statute of limitations. This was in 1705. In the late case of *Williams* v. *Jones,* (13 *East,* 439.) the court of the K. B. held, explicitly, that the *English* statute of limitations was to govern, notwithstanding the parties had contracted abroad, and resided abroad so long as to have been barred by the foreign statute of limitations. The statute of limitations was considered barring the remedy only, not as extinguishing the right. Lord *Ellenborough* said, "There was no law or authority for saying, that where there is an extinction of the remedy

1817.

DECOUCHE
v.
SAVETIER.

1817.

DECOUCHE
v.
SAVETIER.

only in the foreign court, that shall operate, by comity, as an extinction of the remedy here also."

The same rule is now the settled law in *Scotland*, where the civil law is adopted as the common law of the land. Professor *Erskine*, in his institutes of the *Scotch* Law, (vol. 2, 581. § 48,) says, that the decisions there had formerly been fluctuating on the point, but that the latest cases had made their own law of limitation the rule of their judgment, and this side of the question he considers to be founded on the better reason. Lord *Kaimes*, (*Principles of Equity*, vol. 2. p. 353.) speaks with peremptory decision, and says, "it ought never to be made a question; for our own prescription must be the rule in every case that falls under it." The same rule is, also, declared, in equally explicit terms, by *Voet*, in his Commentaries on the Pandects. (*Com. ad Pand.* lib. 44. tit. 3 § 12.) *Si præscriptioni implendæ alia præfinita sint tempora in loco domicilii actoris, alia in loco ubi reus domicilium fovet, spectandum videtur, tempus, quod obtinet ex statuto loci, in quo reus commoratur.*

The counsel for the plaintiffs also referred to a passage in *Pothier*, (*Trait. de la Prescription*, No. 251.) to show that the law of prescription, of the plaintiff's domicil, ought to govern; but I apprehend that *Pothier* alludes only to the various and unequal periods of limitation prevailing in the different provinces of *France*, of which he gives examples in the section succeeding the one cited. He was not speaking of foreign rules of limitations, *extra territorium*. *Pothier* has, again and again, recognized (*Trait. des Ob.* No. 642. 654. 684.) the distinction admitted in so many authorities, that a plea of the time of limitation does not extinguish the debt, but only bars the remedy. The *French* law of prescription, like ours, appears to be intended to apply to, and govern, directly and positively, all persons whomsoever, who cannot bring themselves within one of the exceptions. (*Trait. de la Prescription*, No. 247. *Code Napoleon*, No. 2251.)

My opinion accordingly, is, that the plaintiffs are enti-

tied to the whole of the property in question; and that the
proposition, on their part, to divide the property with the
unfortunate children of *C. J. F.*, who are defendants, is
very beneficial to the latter, and ought to be accepted.

3. I am of opinion that the proposed compromise is,
also, beneficial in another view of the case.

The widow might have waived her rights under the
marriage contract, and have sued for her moiety of the
personal estate of her husband, under our statute of distri-
butions.   I see no impediment to her right of election.
The contract was for her benefit; and to waive it, was
yielding her title to the whole, and accepting of a part.
It is said (*Inst. au droit Francois par Argou*, tom. 2. p. 30,)
that upon the dissolution of the community, by the death
of the husband, the wife, or her heirs, may renounce, or
accept her rights under it.   The representatives of the hus-
band would surely be estopped, in this case, from setting
up the marriage contract as a bar to her claim to a distri-
butive share.   That contract was made and intended for
the connubial state; and to give it the due effect, the par-
ties ought to have continued faithful to each other; in-
stead of which, we find that the wife was deserted by the
husband, in 1792, after he had formed an adulterous con-
nection; his lawful wife was left without protection
and support; and, after a great number of years, she
ended her life in a hospital.   It is not for the represen-
tatives of such a husband to set up, in bar of a distributive
share, under our statute, a marriage contract which he had
thus violated and abandoned.   If the widow might have
waived her benefits, under the contract, and have resorted
to her title at law, her representatives who have succeed-
ed to her rights, are entitled to the same privilege.

If the demand was now of a moiety of the personal
estate, under the statute of distributions, there could be no
bar to the claim, for we have already seen that the *ad-
ministratrix*, holding that moiety in trust, could not have

1817.

DECOUCHE
v.
SAVETIER.

interposed that statute. If the statute runs at all in such a case, it can only commence from the time that the defendants succeeded to the property, under an assumed right, as owners by virtue of her will.

It may be said here that the statute gives an action at law of debt, detinue, or account, to any person entitled to a distributive share. This is a recent provision,[*] and was no doubt intended for the ease and favour of the persons entitled to distributive shares. But I should apprehend it was not the intention of the legislature, by that favour, to abridge the long-established remedy which legatees and the next of kin possessed in this Court. It could hardly have been intended, that executors and administrators might violate their trust, and appropriate the estate to themselves, if the legatees, or next of kin, had not made their demand within the short period of six years. Such a new and alarming relaxation of the powers of this Court over such trustees, is not to be presumed, and could not have been intended. I admit the general principle, that if the equitable and legal titles so far correspond, that the only difference between them is, that the one must be enforced in equity, and the other at law, the equitable title must be acted upon in the same time that the legal should be, or it will be barred. But this rule is where there is *no subsisting trust ;* and Lord *Manners* mentions *that* circumstance, as forming an exception to the rule which he so emphatically lays down. (*Medlicott* v. *O'Donel*, 1 *Ball* and *Beatty*, 166.) Courts of equity are not within the words of the statute of limitations; that statute is adopted and applied by the discretion of this Court, to suits in equity, that are analogous to those in which it is applied at law. But it has been always the doctrine of the Court that legacies are not within the statute of limitations. (*Parker* v. *Ash*, 1 *Vern.* 256.) The same reason applies to distributive shares, and with equal force. They are considered in, at least, as strong a

*\* Vid.* 1. *R. L. (K. and R.)* 540. 24 *Sess. ch.* 74. *sec.* 18. 7th *of April.* 1801.

light as debts by specialty, and are not barred, except un-
der the same prescription, arising from lapse of time, that
would bar a bond. Within that time, I should not be wil-
ling to protect an executor or administrator from the pay-
ment of a legacy or distributive share, when he admits
the trusts and admits the assets, and sets up only the lapse
of time.

The demand is founded on documents partaking of the
nature of a record, as the probate in the one case, and the
inventory in the other. The principle on which the court
proceeded, in *Pomfret* v. *Windsor*, (2. *Ves.* 472.) was that
the statute of limitations affords no protection to an admi-
nistrator against the party calling for his distributive share,
though, no doubt, an administrator, as well as an executor,
may plead the statute against a creditor of the estate, as
was done in 3 *Atk.* 70. They are only responsible in the
peculiar character of trustees, and to the extent of that
character, in respect to legatees and the next of kin, and
in some other special cases.

If the plaintiffs, then, are entitled to claim the distribu-
tive share of the wife, they could recover interest upon it,
at least after one year from the intestate's death, seeing
that the assets were appropriated by the administratrix to
the purposes of business, and yielded great profit.

This recovery, however, would not exceed, and would
probably fall short, of a moiety of the property now offered
to be divided between the parties to this suit. But it is to
be observed, that if the marriage contract is laid aside, the
next of kin of *C. J. F.* would be entitled to the other moiety
of his estate, which would sweep away the whole from these
unfortunate children who are now before the court. The
terms of compromise are therefore, beneficial, as well
as fair, in this point of view, so that, *quacunque via data*,
the terms ought to be accepted.

I shall, therefore, declare, that it is for the interest of
the infants that one equal moiety of the property in the

possession of the two defendants, who are executors and guardians, after deducting therefrom their reasonable expenses and costs, in the defence of this suit, be paid to the plaintiffs, in full satisfaction of their claim, and that the residue of the costs be borne by the parties respectively.

Order accordingly.