The bill was filed by Daniel Hudson, administrator of Betsey Workman, and stated that he being in possession of a farm and three houses, c., in Milford hundred, an action of ejectment was commenced against him on the demise of Lowder Layton, in July, 1811, for one of them, to which he appeared by counsel; and pending said suit an agreement in writing was entered into between him and Layton, to the following effect, viz: — that Layton, to whom Hudson was indebted in the sum of $1,300, should keep one of the houses at $300, and receive the rents of the other property until his debt was paid, when he was to convey it in fee to Betsey Hudson; and that Layton, thereupon, recovered judgment by consent in the ejectment suit, and went into possession of the property. Betsey Hudson married Philip Workman and died, leaving one child, which also died, and its father became its heir at law, and on the 13th of August, 1840, conveyed the property to Hudson in fee: that the rents had fully satisfied Layton's debt, and he refused to convey the property according to his agreement, which was drawn by Layton's counsel, executed and delivered to Hudson, and performed on his part. It was in these words: —
 Dr. Cr.
 $1,300. — Sadler's shop — Layton to, keep — $300.
All the rents which may be received from the Rounds farm and the property purchased in Milford, excepting the Sadler's shop, after *Page 75 
the first day of January next, are to be applied to the discharge of Mr. Layton's demand of $1,300; and when that demand is discharged, with interest, Mr. Layton is to convey the property in Milford, excepting the shop aforesaid, to Betsey Hudson, in fee; and allowance is to be made Mr. Layton for repairs and taxes.
 LOWDER LAYTON, DANIEL HUDSON.
The answer admitted that an ejectment was pending between these parties in 1811, for certain property, and that judgment went for the plaintiff by consent; but the respondent denied that it was in consequence of the alledged agreement, of which he had no recollection until it was brought forward in 1842 by Hudson, in a bill in equity, which stated that it was made at a different time and for a different purpose, and on a different consideration, from that now set up; which suit was after this defendant's answer filed, withdrawn. The agreement was without date, and the answer assigned to it an entirely different origin, consideration and object, from those stated by the bill; and denied the equity of the bill altogether. It alledged that the paper was a memorandum of a proposed agreement between these parties at the May term, 1810, when this property of Hudson having been sold by virtue of several judgments, in one of which Layton had an interest, a rule was obtained to set aside the sale, and' also to vacate that judgment, pending which rule this arrangement was made, and was immediately abandoned by Hudson, who prosecuted the rule, and set the sale aside. The defendant also relied on the lapse of time and laches of complainant, as well as the discrepancies in his own statements made under oath as to the agreement.
Depositions were taken on both sides, but the testimony was, from the length of time since the transactions occurred, indefinite and uncertain.
The case was argued by Mr. Saulsbury and Bates, jr., for complainant; and by Messrs. Layton and Bayard, for the respondent.
Bates, jr. — The bill is for specific performance of an agreement for the conveyance of land. It is not disputed that such an agreement was made, though its object is denied.
The defence set up by the answer is — 1. That the agreement was avoided by Hudson himself. 2. Want of consideration.
The answer says the agreement was made at May term, 1810, *Page 76 
pending a rule to show cause why the sheriff's sale should not be set aside. This is matter not responsive to the bill, and respondent is bound to prove it. The proof of execution of the agreement and of the fact that Layton entered into possession is enough of itself to put the defendant upon proof of his answer. As to the statements in the bill and matters to which the defendant is interrogated, his answer puts complainant on proof; but matter not responsive to the bill, nor inquired for, goes for nothing unless proved. The principle on which it rests is that the complainant makes the defendant a witness, and his answer is, therefore, evidence. But the answer to matter not inquired for is no evidence. [1 Johns. Rep. 580; 8 Cow. 387; 14 Johns. Rep. 63; 2John. Ch. Ca. 62, 87; 1 Iredell's Eq. Rep. 332; 4 Paige Rep. 113; 8Pick. 113; 15 Maine Rep. 125; 1 Gill Johns. 281.] The defendant could have answered yea or nay to the allegation and interrogatory in relation to the execution of the agreement; every thing which he has introduced in explanation of what should have been his answer, is voluntary, not responsive, and not evidence.
The defendant no where alledges from his own knowledge that the facts stated are true, in relation to the date of the instrument. [5 Daniels'Chan. Pr. 404; 1 Madd. Ch. 443; 1 Ves. 95; 1 Paige Rep. 210.] The denial must be positive, even when it is responsive, to make it evidence. The defendant does not deny that the agreement was made pending the ejectment; but this must be taken with his previous statement that he had no recollection of it.
The answer must not only deny positively, but show that the denial is from knowledge and recollection, to make it evidence requiring two witnesses to controvert it. [9 Cranch 123; 3 Cond. Rep. 319, 325.] We are, therefore, not bound to meet the denial of the time of executing the agreement with any evidence whatever. This testimony shows that the agreement was not entered into pending the rule to set aside the sheriff's sale in 1810, but was entered into as a compromise of the ejectment cause in 1813. The testimony is positive; pertinent; unimpeached; and must be taken to be true; it is from members of the family; speaking of the result of a law suit for the house over their heads, and not likely to be forgotten. It was a simple matter to recollect, viz: that Hudson gave up the property to his opponent, for him to retain it, until out of the rents his debt to Layton should be paid; he, then, to return it. It is corroborated by circumstances. At the sheriff's sale to which the defendant *Page 77 
refers the agreement, Layton was not the purchaser of all the property; another person bought No. 2, the Sadler's shop. The agreement is in the handwriting of Thomas Clayton and Henry M. Ridgely, the counsel of the parties. The agreement stated in the answer about the rule to set aside the sheriff's sale, supposes that the rule should be discharged; yet in violation of that agreement, if such had been made, the rule was made absolute. Can we believe that counsel would have so violated an agreement made under their sanction? There is no inconsistency in applying this agreement to the compromise of the ejectment suit in 1812. At that time Mr. Layton was the purchaser of all the property, and the parties could make a contract in reference to No. 2. The ejectment grew out of that purchase. Layton bought all the property at sheriff's sale, on a judgment of Walker Sipple vs. Daniel Hudson, and then brought ejectment. Hudson was in possession. Nos. 1 and 3 had been purchased with money derived from the property of Mrs. Hudson, and the title made to her child Betsey Hudson. He resisted the title of Layton under the sheriff's sale, on process against him, for this reason. The interest of Betsey Hudson was the subject of controversy in the ejectment; the agreement secures this interest to her as to that part of the property, and does not secure any interest in No. 2, for she had no interest in that. The result of the ejectment suit proves the same thing. It was a judgment by consent; the result of a compromise. This is the main question in the cause, whether it was made in 1810, on the pendency of the rule to set aside a sheriff's return; or in 1813, on a compromise of the ejectment suit.
2. Has the agreement a sufficient consideration. The defendant himself assigns a consideration for the agreement he sets up. The statute of frauds has nothing to do with it. If it were altogether by parol; being entirely performed on our part, we could compel a complete performance on the other side; and prove even a parol contract. [1 Harr. Rep. 540, Townsend vs. Houston.] But we have a written agreement. What does it show? — 1. An agreement; for it is signed by both parties. 2. That Layton had a demand against Hudson for $1,300. 3. That this demand was to be paid by rents of property of which Hudson was in possession, and which he was to give up to Layton. 4. That when this was done, Layton was to convey to Betsey Hudson. A consideration need not be stated, if it can be collected from the paper; and for this purpose the circumstances *Page 78 
surrounding the agreement may be regarded as explaining it. [2 Stark.Ev. 567; Chit. Cont. 104; ib. 517, 519; Smith Cont. 56; Law Lib. 39.] The delivery of possession of the land, and payment of the debt to Layton thereout was a result rather than a consideration of the agreement. Being a compromise respecting the title of Hudson to the land, Layton cannot now go behind the agreement to show want of title in Hudson, as proving want of consideration for the agreement.
The compromise of a suit is itself a good consideration to support an agreement. [Chitty Con. 44-5; 1 U. S. Dig. 102.]
Betsey Hudson died leaving a child which died, and Philip Workman its father inherited. He conveyed to Daniel Hudson. The Chancellor denied relief, on the ground that Daniel Hudson through this means had the legal title, and could bring ejectment at law against Layton. Where does it appear that Betsey Hudson ever had the legal title? And such an objection being an objection to the equitable jurisdiction, could have been made only by plea, demurrer or at least by the answer; that is where the court has general jurisdiction of the matter, but where from certain circumstances it is contended that the particular jurisdiction does not exist.
And if Daniel Hudson had power to recover the land by ejectment against Layton, that is not the relief he claims; he wants Layton's conveyance for the land, and an account of the profits, according to the agreement. The conveyance is also necessary to settle the title, which was the object of the agreement. Layton claimed title as purchaser at the sheriff's sale; and this agreement binds him to make a deed which shall settle the claim.
But Hudson, if he had the legal title could not maintain ejectment. Layton's possession was a lawful one; until the rents paid Layton's debt, he had a right to the land. Hudson was compelled into chancery for an account, and the court will decree both account and conveyance.
The lapse of time was also relied on below. If there were any bar, it would be twenty years after the debt was paid, and this cannot be ascertained until after the account is taken. It can only be after twenty years from the time at which the defendant was bound to convey to Betsey Hudson. [2 Story. Eq. § 1520; Blans. Lim. 68, 71, (Law. Lib.) 2Atk. 359; 1 Meriv. 114.]
No advantage can be taken of the act of limitation, unless pleaded, *Page 79 
or set up by the answer. [2 Mad. Cha. 307; Mit. Pl. 344-5; 2 Barb. Har. Dig. 217; 4 ib. 375.]
It is a trust which no time will bar. When the debt of Hudson was paid Layton became a trustee to Betsey Hudson. [2 Daniels Ch. Pr. 91-2-3;Blans, Lim. (1 L. Lib.,) 3, 4, 5; 2 Sch. Lef. 633; 5 Barb. Har. Dig.
373, 367; 10 Wheat. 152; 6 Cond. Rep. 47; 3 Johns. Ch. Rep. 190, 216.]
[Bayard. — It is now fully settled that twenty years lapse of time will defeat a trust, unless account or other matter takes it out. (SeePerkins vs. Cartmell, 4 Harr. Rep. 270.)]
Bayard, for defendant. — The objections to the relief prayed are so numerous that it is difficult to choose among them. The complainant files a bill stating this agreement as we state it, to have referred to the pendency of the rule to show cause why the sheriff's sale should not be set aside; dismisses his bill and files another stating the agreement to have referred to an ejectment suit, at a later period. How does he reconcile these statements? The second bill states that Daniel Hudson, without alledging any title to the land, or that Betsey Hudson had any title; but simply a possession in himself, under the "claim of a right and interest," entered into an agreement with Layton, pending an action of ejectment, to this effect; that he would surrender the possession to Layton until a certain debt was paid, and that Layton would then convey the title to Betsey Hudson. The agreement is stated as an agreement of compromise. Of what is it a compromise? It is not stated to be in the cause. He has stated no title compromised or settled; nor to what it relates; nor upon what consideration. If it was the title of Betsey Hudson, no compromise by Daniel Hudson could effect that without showing his agency; and there is no claim for specific execution, except on such a title. There is no connection between the agreement and the judgment in ejectment.
The discrepant statement by Hudson in his two bills, would of itself deprive him of relief; but at best he states a case in which he has had full right to the relief prayed, for more than twenty years. He makes no excuse for the delay; he fails to examine the witnesses present at the agreement; the counsel who drew the papers; and gives no excuse for not examining them. Avoiding all such testimony, he resorts only to his own sisters to explain the agreement; persons who could know nothing about the matter but what was derived *Page 80 
from him. He states no demand or claim from the time when he shows the right of action accrued, for more than twenty years.
The answer denies the agreement as stated in the bill positively; it also makes from recollection and belief, the defendant's statement of the time and circumstances and object of the agreement, being entirely different from the agreement stated in the bill. The denial is responsive to the bill. The statement is that the property was sold by execution as Hudson's property, and bought by Layton; the bringing ejectment and recovery as to one piece of property only. The Rounds farm was bought by Layton and conveyed to his son, as early as 1810.
The agreement stated in the bill is, that Hudson being in possession of the land agreed to deliver up possession on the terms stated in this paper. The paper itself is no agreement; it requires additional facts. It is nothing without stating the title of Hudson, or his daughter, as the matter in relation to which the agreement was made; without that it is nudum pactum. Now, though I agree that matter of defence must be responsive to the bill to be evidence in itself; yet the plaintiff must prove his own case sufficiently to entitle him to the relief prayed; and whether our account of the agreement be proved or not, it still lies on the complainant to prove his case.
There can be no decree on the agreement admitted, because it was not executed, and entirely failed.
The statement of the second bill is disproved by that of the first. The deed of Workman to Daniel Hudson five years before, by the acceptance of which Hudson was bound by the recitals, proves that this last statement is false and fraudulent. It establishes the statement of the first bill, similar to the answer. It states an agreement by Layton as purchaser of the land, to avoid a rule to set aside the sale. The second bill states the agreement three years after by Layton, the purchaser, after confirmation of the sale and sheriff's deed, which conveyed him title; an agreement by the legal owner of the land to give it up when it should pay his debt; to procure a decision of an action of ejectment for respondent: — that Layton, the owner of the land in fee, without any objection to the title, made an agreement, without any consideration, by which he agreed to stand as a trustee for Betsey Hudson, in his own land. And this in a case where no title whatever is alledged in Betsey Hudson. Even if the facts showed any title in Betsey Hudson, this agreement would not have bound her, and therefore, does not bind Mr. Layton. *Page 81 
the obligation is not mutual. [1 Harr. Rep. 411, Carlisle vs. Fleming; 3 T. Rep. 653.] It is also void for want of any consideration unless it be shown that Betsey Hudson had some color of title. There can be no consideration arising from a compromise of title, unless some color of title be shown. The pernancy of profits was no consideration. Layton was entitled to the land as purchaser under the sheriff's deed, and also to the profits; the allowing him to take that which he was entitled by law to take, is no consideration for any contract to convey. And no such consideration moved from Betsey Hudson.
Supposing a consideration proved, this is an executory agreement relating to lands, in which the consideration as well as the promise must, by the statute of frauds, be in writing and appear on the face of the agreement. [4 Barn. Ald. 595, Saunders vs. Wakefield.] There is no consideration stated here, and none could be drawn from the accompanying facts, unless they prove Daniel Hudson to have been the owner of the land, which he was not.
No part performance has been proved to take the case out of the statute of frauds. The bill states that Hudson delivered possession, but does not state this to have been the consideration of the agreement; and it states that judgment was rendered in the ejectment, but not under the agreement; nor even that the agreement was made in that cause. Layton denies positively under oath that Hudson, put him in possession; and this is responsive to the bill. He went into possession by force of the law under the recovery in ejectment; and it is not stated as a consideration that Hudson agreed to submit to that judgment.
Mr. Layton. — The first bill is evidence against complainant, as his statement, whether drawn by him, or by a solicitor. It states an agreement so different from the last bill, that it cannot be told which is true. [Bull N. P. 234.]
The paper containing the agreement itself has been mutilated whilst in complainant's possession. The date has been torn off; and the date is all important. It inferentially refers to a date. There is uncertainty as to what was meant by the property purchased in Milford; there were two purchases, and not of the same property. The first bill states a purchase of the Davis farm by Daniel Hudson, and the payment for it himself; the second states, and the two sisters prove, a purchase with the money of Betsey Hudson, though Betsey Hudson was born, according to Mrs. Collins' *Page 82 
evidence, after the purchase of the Davis farm. These witnesses swear "in verba magistri," that the legal estate was out of one and in another just as suits the case, while they carefully avoid any expression which would show their relation to the complainant. It is vital to the complainant's case to establish fully that the lands referred to in the agreement were the lands purchased at the second sale, under Walker Sipple's judgment. At the first sale Layton bought two parcels only; at the second sale he bought all. There was some reason why Layton should agree to accept possession of the lots as a security for the money he had lent Aydelott, at the return of the first sale; but none at the pendency of the ejectment, which was after the second sale. The first sale was on Aydelott's judgment vs. Hudson. That judgment had been entered in Kent after a judgment in Sussex on the same bond, and without any testatum. Both the sale and the judgment were in danger; Hudson threatened to set them aside; Layton wanted his money secured; his counsel advised him his Kent judgment was good for nothing, and his Sussex judgment was no lien on the Milford property; he might well then agree with Hudson, if he would discharge his rule to set aside the sale, that he, Layton, would take the Milford property in pledge, and convey it to Hudson's daughter after his debt was paid. But after Hudson violated this agreement: set aside the sale and put Layton to record his judgment in Kent properly by testatum from Sussex, and after a re-sale and purchase of the property under Sipple's judgment, which was good, and Layton became the purchaser of all, and was in possession of two-thirds and entitled to possession of the other parcel, which Hudson still held, there could have been no motive or reason or consideration for an agreement to become a trustee to Betsey Hudson for his own land.
The rules of evidence are the same at law and in equity; the best evidence is to be offered; why not examine the counsel who drew the agreement? No explanation of this is offered. Ridgely and Clayton were both alive when the testimony was taken. The paper though called for was never annexed to the record, and a copy furnished which gave us no notice that Ridgely and Clayton drew the agreement, nor could we have brought it to their memory without showing them the agreement.
Hudson kept the agreement fourteen years, when Workman was entitled to it, if his present bill is true, and got a conveyance from Philip Workman many years after the death of his wife, probably *Page 83 
without consideration. The affirmative is to be proved. It is in this case that the consideration of the agreement was the compromise of the ejectment cause, and that it was made at the October term, 1843, This is flatly denied by the answer. The complainant must prove it by two witnesses or his case fails. Neither of the witnesses says that the agreement was made on a compromise of the ejectment case; nor that the defendant was let into possession under it, which is essential in proof of performance. [If the agreement is proved it is without consideration. [1 Mad. Ch. 273; 4 Johns. Ch. Rep. 497; 3 Harr. Rep. 366, Reynolds vs. Lofland; Smith's Cont. 50, (56 Law Lib.) The agreement states no consideration, and this cannot be supplied by parol. The consideration must be such as can be collected from the face of the agreement. There is no proof of the compromise; none of the surrender of possession; none of the property.
[Mr. Bates. — The consideration was the delivery of possession and receipt of rents and profits.]
[Layton. — There is nothing in the agreement stating such a consideration; nor in the bill; and it is not competent to go out of the instrument to prove such consideration.]
[Mr. Bates. — The consideration appearing on the agreement, and which is all sufficient is, that Mr. Layton was to receive the rents and profits of the land in payment of the debt due from Hudson to him.]
Layton. — That is a new version. Yesterday the consideration was the compromise of the ejectment suit; then it was the delivery of possession to Layton; now it is the permitting Layton to receive the rents of his own land, in payment of a debt due to him, on condition that he would account to Hudson for them, and give up the land after the debt should be paid.
The agreement is invalid for want of mutuality of obligation, if the consideration now insisted on is the true one. The property is alledged by the bill to have belonged to Betsey Hudson, and how can an agreement by Daniel Hudson to permit Layton to receive rents of her land, be the consideration of a promise by Layton after Hudson's debt to Layton is paid out of them, to convey the land to Betsey Hudson? The agreement is uncertain as to the land intended, which is a patent ambiguity that cannot be supplied by parol. [Ch. Cont. 104, 1 Mad. Ch. 426.] What lands are here *Page 84 
meant? Of which was he to receive the rents? Lands purchased by Layton. When; — the first or second purchase?
If there had ever been a valid agreement here capable of enforcement, it has become so stale; the party has so long slept on his rights, that a court of equity will not enforce it. The agreement was in 1813, as they say, pledging lands to pay a debt which according to their statement would have been paid in 1825 or 1826, and the bill not here filed until 1847, though there was full competency to file it. No specific performance can be decreed of a contract which has lain dormant for many years. [5 Vin. Ab. 534; 1 Fonb. Eq. 329-30-2; 4 Harr. Rep. 270, Perkins vs. Cartmell]
Saulsbury, in reply. — The statements of the first bill of Daniel Hudson being the mere suggestions of counsel, are not evidence against him. The bill was dismissed for the purpose of correcting its statements. [7 T. Rep. 2; Gresly's Eq. 322.] The argument of the defence founded on discrepancies between the first and second bills, therefore fails in law.
The assumption that Daniel Hudson, by the second bill, alledges notitle to the land fails in fact. The bill does aver a possession claiming a right and interest in the property. If there was a defect in the bill in this respect, it is supplied by the answer, which sets up a title in Daniel Hudson.
The non examination of Ridgely and Clayton has been urged as evidence of fraud. It arose from the neglect of the defendant to put in his answer in time to take Mr. Ridgely's deposition. Application was made to hasten the answer for the purpose.
Layton. — The answer was delayed for want of the agreement, which was refused by the express orders of the complainant, and we got a copy only on the order of the Chancellor.
Mr. Saulsbury. — The respondent was not to answer the original paper. He was to answer the agreement as set out in the bill.
As to the relationship of the witnesses examined to the complainant; this has been presented as a badge of fraud. The witnesses were residents in the property in reference to which the agreement was made. It was the homestead. They knew better than any other the description of the property, and were more likely to remember the terms of the agreement.
The bill erroneously states the number of the property; the depositions correct this. The sadler's shop was No. 2. The bill *Page 85 
merely misstates the number; not the property; it locates the property correctly as proved by the witnesses.
The manner of their giving their testimony is complained of. It was said they swear in the words of the questions. If the evidence closely follows the interrogatories, it was natural; and the fault, if any, was a fault of the commissioner.
The delay of bringing suit. Why should the complainant have come sooner; and how can the court now know that he should have come sooner? He was not entitled to come until the rents had paid $1,000, with interest, taxes and repairs. The annual value is indefinite. The farm was a mere waste, scarcely worth any thing. The respondent fixes its value at $70. Interest, taxes, c., would consume this. If they rely on the act of limitation they were bound to plead it. [4 Harr. Rep. 270, Cartunell vs. Perkins; 2 Story 29, § 1820.] If they rely on the equity doctrine of withholding relief to stale claims on the ground of laches, the court takes the case as it stands to judge of the laches. Here was a trust, not to be enforced until a debt was paid out of rents, which would take long time to do.
Wherever the trust is a continuing trust, the doctrine of laches cannot apply until the right of suit attaches, any more than limitation can begin to run.
The agreement is set out in the bill verbatim. It is apparent that it cannot apply to the rule to set aside the first sale, because Layton did not buy No. 2 at the first sale, and the parties could not contract about other property; and how could Layton keep what he had not bought.
The recital to Workman's deed proves nothing. The admissions in that recital cannot bind us when Mr. Layton expressly denies the truth of these recitals in his first answer. A recital may bind parties and privies, but strangers cannot take advantage of it. As against Philip Workman the recital might bind Hudson, but not as against Layton, who has no interest under, and is not bound, by that deed.
Mr. Layton's answer is not evidence, unless strictly responsive to the bill. The answer referring the agreement to the sale of 1810 is not responsive, and not evidence. The denial of its reference to the ejectment suit though positive in words, shows that it is a denial without recollection. It is a denial that does not make proof *Page 86 
by two witnesses necessary. Like all other cases, it must be decided on a preponderance of testimony.
The Chancellor erred in refusing relief because we had remedy in a court of law. Having the legal title is not fatal to our case, if the remedy at law would not be complete, and we could not have remedy there either for an account or to compel a conveyance.
Want of mutuality of obligation. Does it lie in Layton to set up the want of mutual obligation in an agreement performed on the part of Hudson? The delivery of possession to Layton was a consideration. Layton is estopped to deny the title of Hudson and his liability under this agreement after enjoying the benefits of it. The agreement admits the right of Hudson to sell him No. 2, and pledge him the other property. [1Greenl. § 207-8; 2 Stark. Ev. 16.]
The consideration of the agreement. We do not state the compromise of the ejectment suit as the consideration; the agreement shows the consideration. The compromise is stated as a matter out of which the agreement arose, and as such may be proved by parol, but not as a part of the agreement. The receipt of rents of the property mentioned in payment of a debt is a sufficient consideration.
If no consideration appeared by the agreement, we could prove it by parol. It does not vary or alter the agreement. [4 Pick. Rep. 70, 73; 15Mass. Rep. 82-7-9.]
It is not for us to explain the motive of Mr. Layton entering into the agreement and uniting the farm with it; enough for us to show his signature to the agreement.
As to explaining ambiguity about the property itself. It is competent for us to explain by parol what is meant by property purchased in Milford; and the answer itself admits what property was meant. [2 Stark.Ev. 547.]
We think ourselves entitled to a decree for an account; and ultimately to a decree for conveyance.
The Chief Justice delivered the opinion of the court: —
The specific performance of contracts is not a matter of right, but rests in the sound discretion of the court, regulated by general rules and principles, and not dependent upon whim or caprice. [2 Story, sec. 742.]
Where a contract respecting lands is in writing, and is certain, fair, equal and mutual, and founded upon adequate consideration, a *Page 87 
court of equity will decree a specific performance. [2 Story, sec. 751;Segden. chap. 4, sec. 2, p. 191.]
But if the intention of the parties, or the motive, inducement or consideration for entering into the contract can be ascertained only by conjecture; or where, by lapse of time, the case is involved in doubt or uncertainty; and generally, where under the circumstances of the case, the court is unable to do exact justice between the parties, a specific performance will not be decreed; but the complainant will be left to his remedy at law. The refusal of a court of equity to interfere, inflicts no injury upon the complainant. The decision in no wise affects his rights to proceed at law for the recovery of whatever damages he may be entitled to; but is the mere declaration of an opinion that his case is not one where the aid of a court of equity can be invoked. [2 Story,sec. 767, 769, 787.]
The bill alleges that the complainant was in possession of, and had a right or interest in three houses and lots in Milford; one of which was a sadler's shop; that the defendant on the 13th of July, 1811, instituted an ejectment for one of the lots designated in the bill as No. 3; that pending the ejectment, an agreement of compromise was entered into in writing, between the parties, at the October term, 1813, of the late Supreme Court; the terms of which agreement are, as is alledged, set forth in the paper writing produced at the hearing of this cause, and signed by the parties, but without any date. The complainant prays an account, from the 1st of January, 1814, of the rents and profits of the premises mentioned in the paper writing; and if the debt is discharged, that the defendant may be compelled to convey the Milford property (excepting the sadler's shop) to the complainant; and if the debt is overpaid, that the defendant may be decreed to pay the excess.
To decree a specific performance in the case, not only the fact of making the agreement, and its terms, must be clearly ascertained, but the consideration on which it was founded, must be established by distinct and unequivocal evidence: and as the time of making the agreement is a very material fact under the circumstances of the case, the complainant should prove it by unquestionable testimony. The defendant admits the paper writing; but positively denies that it was made or signed, at the time, or for any such purpose, or upon any such consideration, or that he went into possession under it, as is alledged by the complainant. Instead of taking the testimony of Messrs. Ridgely and Clayton, the attornies of the parties, in *Page 88 
whose hand writing the paper was drawn up, and who were best acquainted with the circumstances of the case, and might have been examined at the time of executing his commission; the complainant resorts to the testimony of his two sisters; who, after the lapse of thirty years, undertake to fix the precise time, and depose to the making and consideration of the agreement, without any knowledge of it, except what they derived from a conversation between the parties. Independently of the uncertainty of parol evidence after the lapse of so many years, the testimony of these witnesses is at variance with the acts and admissions of the complainant on the same subject.
In the year 1843, he filed a bill against the defendant for a specific performance of the same agreement, alledging that it was entered into by these same parties in reference to another transaction, that it was founded upon a different consideration, and made two or three years prior to the time mentioned in the present bill. The former bill states that the complainant's real property had been taken and sold under execution process, and purchased by the defendant; that a rule was obtained on the part of the complainant, to show cause why the judgment and execution should not be set aside; that pending this rule, the paper writing upon which the present suit is founded, was drawn up, and the agreement made in consideration of a compromise of the rule. It is conceded, according to modern decisions, that a bill in equity is not evidence against the complainant of the truth of the facts contained in it, so far as they may be taken as the suggestion of counsel. But a bill is always evidence for the purpose of proving as a fact, that it was filed or dismissed. And surely in another suit in equity, between the same parties, and upon the same subject matter, the dismissed bill would be proper evidence to prove as a fact, that it contained a certain statement, which, whether true or false, differs entirely from that contained in the bill, upon which the complainant seeks the aid of the court. So also does the recital in the deed from Workman to the complainant contradict his statement in the present bill, and the testimony of his sisters; and accords with the statement contained in the bill which was dismissed. The recital shows that the agreement was entered into in the year 1810, pending the rule to set aside the sheriff's sale; whereas, the present bill states that the agreement was made and the paper writing, signed in October, 1813, pending the action of ejectment, and for the purpose of compromising *Page 89 
that suit. The recital is evidence against the complainant as an admission, but not conclusive, as the defendant was not a party to the deed. The complainant, therefore, had a right to repel or explain the admission; but not having attempted to do either, the statement in his present bill, both as to the time and consideration of the agreement, is not sustained by sufficient evidence, and the subject is left in doubt and uncertainty.
But besides the discrepancy between the complainant's bill and his acts and admissions, no adequate consideration appears to support the agreement. No motive or inducement existed on the part of the defendant to make it; and no right at law or in equity was surrendered or suspended on the part of the complainant. Why should the defendant have agreed to the terms mentioned to have been made by way of compromise to the ejectment, or of the title to the premises purchased by him at sheriff's sale? The judgment and execution under which the sale was made, would have been conclusive evidence against the complainant on the trial of the ejectment. His title, whatever it was, became vested in the defendant, as purchaser. What was there then to compromise? If Hudson had no title; and the legal title, as he alledges, was in his infant daughter, Betsey Hudson, then about five or six years old; his agreement with Layton could not protect the latter from the assertion of the daughter's title, at any time during the period of her infancy, or within ten years after her arrival to full age. The case then is simply this. Layton, in the year 1813, when this transaction is said by the complainant to have taken place, having title to the lands under a sale and deed made by the sheriff, prosecuted an ejectment against Hudson to obtain possession, which he must inevitably have recovered. But he agrees to take possession under the authority of Hudson, and hold as a mortgagee; to treat the lands so purchased by him as mortgaged for the payment of his own debt against Hudson; to apply the rents and profits in discharge of such debt; and when discharged, to convey part of the premises to Betsey Hudson, who already held the legal title, over which neither the complainant nor the defendant could have any control; and who might at any time during her infancy, or within ten years after it ceased, have turned Layton out of possession, and recovered the mesne profits for her own use. It is impossible from any evidence in this cause, to determine with certainty, when this paper writing was made; what was its true consideration; or to what transaction *Page 90 
it had reference; whether to the ejectment in 1813, or to the rule for setting aside the judgment and execution in 1810. The most probable conjecture is, that it was drawn up as the proposed basis of some ulterior arrangement; which from some cause, now inexplicable, was not carried into effect. The conduct of the complainant accords with this conjecture. He says the paper writing, when signed in October, 1813, was delivered to him, and has been retained in his possession ever since. It does not appear, nor does he alledge, that he ever communicated to his daughter the existence of this paper taken for her benefit, and to which so much importance was attached. She became the wife of Philip Workman, died many years after the agreement was made, and left to survive her an only child, her heir at law, and Workman, her husband; to whom, on the death of the child, the legal title passed, under the intestate laws. After the lapse of fourteen years from the death of Betsey Hudson, the complainant, on the 13th of August, 1841, obtains a deed from Workman for the legal title to two of the houses and lots in Milford. During a period of at least thirty years no demand is made on the defendant for an account, or touching any other matter in relation to this agreement; either by or on behalf of Hudson, his daughter, her child, or her surviving husband. The whole subject slumbers in oblivion, until the complainant's first bill is filed in 1843; in which, as in the present bill, he prays for an account, and that the defendant may be compelled to give him a deed of conveyance for the premises in question; at the same time insisting that the legal title had already been conveyed to him by Workman's deed.
The complainant, therefore, has failed to sustain the case presented in his bill. The time when the agreement was made, the transaction to which it refers, the consideration or inducement for making it, all depends on mere conjecture, and are involved in uncertainty. Accompanying these difficulties, which embarrass the case, is the strong objection arising from lapse of time. In such case, where there have been laches and neglect, a court of equity remains passive, without reference to the usual presumption of payment, or analogy to the statute of limitation. It is the established doctrine of courts of equity to refuse their aid, or to interfere, after a considerable length of time, and where there has been a want of reasonable diligence. The doctrine is founded on public policy, the peace of society, and the difficulty of doing entire justice, when the *Page 91 
original transactions have become obscure by time, and the evidence may be lost or depends on the precarious memory of witnesses. (See Perkins vs. Cartmell, decided by this court, 4 Harr. Rep. 270, and the cases there cited. Holt vs. Rogers, 8 Wheaton 433.]
The opinion of the court is, that the complainant not having made out a case proper for the interposition of a court of equity, the decree of the Chancellor be affirmed, and that the complainant pay the costs.
 Decree affirmed.