HENRY BECHTOLD et al.

v.

NATHAN S. READ et al.

| 49 | 111 |
| 49 | 428 |

1. In case the administration of an estate in the orphans court be imperfect, or incomplete, and serious complications are presented, or the aid of an injunction be necessary, it is proper for the party seeking relief to ask the aid of this court.

2. In answer to the question of laches, evidence will be admitted showing that the party who is charged with laches was resident in another jurisdiction.

3. In the application of the doctrine of laches, where rights of *cestuis que trust* are involved and the trustee is charged with fraud, the latitude extended in favor of the *cestuis que trust* is very much more liberal than in other cases where the same defence is relied upon.

4. The doctrine of laches should never be applied to *cestuis que trust* until a reasonable time has elapsed after the trustee has performed the duties and discharged the obligations required of or imposed upon him by the law or instrument under which he is acting.

5. If the estate which the trustee has in charge, or any branch of it, be unadministered, so that the rights of the legatees or devisees are unascertained or uncertain, so that a suit in equity or an action at law will not lie therefor, it does not become the trustee to charge such legatee or devisee unless it can be shown affirmatively that the legatee or devisee has, with a full knowledge of all the facts and an understanding of his rights, ratified the neglect of the trustee.

6. Legatees or devisees who are interested in having land discharged of a burden may call executors to account, but they are not obliged to do so in order to protect themselves against the charge of laches by such executors.

7. Where a bond and mortgage are inventoried by three executors and two appraisers at their face value, and in six months thereafter they acknowledge the receipt of the whole amount due thereon, less $280, in an assignment thereof, and the assignee actually pays, through its attorney, to one of their number such face value, who pays back to the attorney $2,400 thereof, the executor will not be allowed, twenty years thereafter, to say that such bond and mortgage had depreciated over $2,400 at the time of the sale and assignment thereof, without strong proof to that end.

8. In such cases where executors all join in making the assignment and acknowledgment of the receipt of the money, and allow one of their number, who is the obligor and mortgagor, to complete the transaction, they will all be held accountable for the loss.

Bechtold *v.* Read.

9. Executors are not allowed to purchase property which they hold in trust. either directly or indirectly. The rule is the same whether the sale of the trust property be made by a sheriff upon a judgment at law or upon a foreclosure of a mortgage, which mortgage was held by the testator in his lifetime, but assigned to the wife of one of the executors, who foreclosed the· same.

On final hearing on pleadings and proofs.

*Mr. Edwin Robert Walker, Mr. G. D.· W. Vroom* and *Mr.. William C. Mayne,* of Philadelphia, for the complainants.

*Mr. Charles E. Hendrickson,* for Mr. Lippincott.

*Mr. Walter A. Barrows, pro se,* and for Nathan S. Read and Mary A. Read, defendants.

BIRD, V. C.

In case the administration of an estate in the orphans court be imperfect, or incomplete, and serious complications are presented, it is proper for the parties seeking relief to ask the aid of this court. It may be said that in case an injunction be necessary for the protection of the interests involved, there is no exception to the jurisdiction of this court, whatever may be the progress towards final settlement in the inferior tribunal. In the case now under consideration it appears that the testator died in November, 1869. In and by his last will he gave and devised to his wife the house in which he then lived, besides the right which she would be entitled to in his real estate as his widow. He gave and devised all the residue of his real and personal estate to the children of his brothers and sisters, and to Nathan S. Read and Mary A. Read in equal shares. After the death of the widow, that portion of his estate to which she was entitled was to be divided as the residue was directed to be.

He authorized his executors to sell and convey any of his real estate at any time within five years. Henry Bechtold, one of the complainants, and Nathan S. Read and Wallace Lippincott,. two of the defendants, were named as executors. They proved the will and took upon themselves the burden imposed thereby..

The inventory which they filed shows personal estate amounting to $8,525.50, of which $7,834 were a bond and mortgage given to the testator by Nathan S. Read, one of the said executors. It is important to remember that this bond and mortgage bore date in April, 1869, as the testator died in the following November. At the time of his death the testator was seized of considerable real estate in and about the town of Riverside, situate at the junction of the Rancocas creek with the Delaware river. This real estate he had caused to be surveyed and plotted out and mapped. There were in all several hundred lots. The testator had made efforts to sell these lands but had not been very successful. The market value of a large number of them was quite inconsiderable.

At the time of his death the testator was indebted on several judgments, the amount of which has not been very clearly established, but which was about $3,736. His other liabilities did not exceed $2,150. Thus, it appears that all the duties which devolved upon the executors, or all the difficulties which they had to encounter and dispose of, were, making sales of the personal property, collecting the said bond due from one of their number, disposing of the real estate, discharging the said judgments and the other liabilities and the expenses of administering the estate, before the legatees could legally claim anything from them. Nothing is more manifest from these statements than that the obligations which the law imposed upon them were very few, very simple and easily comprehended by the plainest business man, and capable of being discharged in a very short period of time with very slight cost.

It should be distinctly noted and constantly kept in mind that within a year—that is, during the year 1870—after the death of the testator the executors come to the conclusion that the estate was insolvent. However, notwithstanding this, no application was made by them to the orphans court with the view of a settlement of the estate by proceedings as in cases of insolvency until the year 1888, eighteen years after they became satisfied, according to their own testimony, that such was the condition of the estate which they had undertaken to manage, not only for

creditors but for legatees. The fact that the will gave them five years in which to dispose of the real estate offers not the slightest obstruction to their proceeding under the statute to declare the estate insolvent.

The will directed them to pay all debts as soon as they conveniently could. As intimated, there were several judgments unpaid which had been obtained against the testator in his lifetime. Levies had been made upon the personal property and upon the homestead of the deceased. But notwithstanding these things, instead of endeavoring to comply with the directions of the will, and of the statute, in such matters, they seemed to be quite, if not entirely, indifferent to their solemn obligations and to the rights of others, until the year 1872, when they offered a portion of the lands named for sale. They then became indifferent until the following year, when certain other lots were offered for sale. The fact that the sheriff sold the personal property which they had inventoried, and the homestead of the testator which he had devised to his widow, was not sufficient to spur them to reasonable diligence. In the years 1872 and 1873 a large number of lots were sold and conveyed; in the latter year a number were conveyed without any consideration received therefor. The reason given for making title without compensation is that they tried in vain to get bids therefor.

In 1875 one of the legatees cited the executors to account. An effort was made by one of the executors to that end, but before his work was complete the pressure which moved him was withdrawn and his efforts ceased. Nothing further appears to have been accomplished in the way of a successful administration of this estate, or even undertaking, until the year 1885, when another citation was issued and an account was prepared by Wallace Lippincott and presented to the orphans court, which shows a balance in his favor of $524. It is this account, filed at this late day, which is sought to be a bar to the action of this court. In addition to what has already been presented, it need only be stated that in 1888 these executors actually commenced proceedings in the same orphans court for the purpose of having this estate declared insolvent, and proceeded so far as to offer a

large number of lots of land for sale. In order to show the
weakness of the objection to the jurisdiction of this court, it is
sufficient to allege the necessity of some tribunal which has the
power of controlling the action of these executors by injunction,
taking cognizance of the case. Further amplification is unneces-
sary.

But it has been alleged with more than ordinary zeal that the
complainants have been guilty of laches, in delaying to file their
bill for nearly twenty years after the death of the testator. A
complete and unmistakable answer to this defence is found in the
facts above given. Perhaps it ought to appear in this connec-
tion that the complainants were for all this period of time non-
residents. At the hearing it seemed reasonable to me that the
accident of locality in a foreign state could not reasonably be
invoked as an excuse for laches, if any were demanded in this
case; but the very highest authority makes it manifest that I
was mistaken. *Taylor* v. *Benham, 5 How. 273, 325.* In the
application of this doctrine of laches when the rights of *cestuis
que trust* were involved and the trustee is charged with fraud,
the latitude extended in favor of the *cestuis que trust* is very
much more liberal than in other cases where the same defence is
relied upon. *Taylor* v. *Benham, supra; Michoud* v. *Girod, 4
How. 563; Decouche* v. *Savetier, 3 Johns. Ch. 190, 216; S. C.,
8 Am. Dec. 478, and notes.* But there is a modification of this
view applicable to the State of New York. See *Kane* v. *Blood-
good, 7 Johns. Ch. 90.*

It seems to me that the doctrine of laches should never be
applied to *cestuis que trust* until a reasonable time has elapsed
after the trustee has performed the duties and discharged the
obligations required of or imposed upon him by the law or in-
strument under which he is acting. If the estate which he has
in charge, or any branch of it, be unadministered, so that the
rights of the legatee or devisee are unascertained and uncertain,
so that a suit in equity or an action at law will not lie therefor,
it does not become the trustee to charge such legatee or devisee
with laches, unless it can be shown affirmatively that the legatee
or devisee has, with a full knowledge of all the facts and an

Bechtold *v.* Read.

understanding of his rights, ratified the neglect of the trustee. Much less will a court of conscience listen with favor to the plea of laches by the trustee, when he has taken title to portions of the estate which has been committed to his charge and retained it without accounting for the highest value thereof. In other words, unless it be shown that the *cestuis que trust,* being *sui juris,* have knowledge of the malfeasance of the trustee for such a long time without complaint that such knowledge may be regarded as acquiescence upon their part, it cannot be said that they are guilty of laches so long as their account remain open and unadjusted by a competent tribunal and for the statutory period of time thereafter. It is true that a legatee or a devisee, where the extent of his interest in lands depends upon their being discharged of some lien or burden by the executors, may call such executor to an accounting, but certainly he is not obliged to do so in order to protect himself against the charge of laches.

In this case, one of the executors presented his account in 1885, and it was then audited and passed by the court. The bill in this case was filed on the 29th day of August, 1889. In the year 1888, as above stated, the executors made application to the same orphans court to have the estate declared insolvent. On the question of laches, these facts must satisfy the most critical. If more be required, let what appears hereafter be considered.

Therefore, it is established that these executors must account in this court. For what must they account? To answer this question, we must ascertain what assets of Samuel Bechtold, Jr., came to their hands. The inventory shows personal estate of the value of $8,525.50. They should be charged with all of this, and credited with so much thereof as was actually disposed of in the payment of debts and the proper and necessary expenses of the settlement of the estate. In such credits they should be allowed for those articles which had been seized upon and sold by the sheriff by virtue of sundry executions.

It is claimed that the executors should only be charged with $5,000, the amount in cash actually received by them upon the

Bechtold v. Read.

assignment of the Read bond and mortgage to the Mutual Benefit Life Insurance Company. I do not see how a court of equity can accede to this claim, taking the facts as they are presented by the testimony. The bond and mortgage were inventoried at $7,834. These executors, acting under the most solemn obligations, together with two disinterested appraisers, all well acquainted with the premises covered by the mortgage, and with the solvency or insolvency of the maker of the bond, valued these instruments at what appear to be due upon their face. They were executed and delivered to the testator about seven months before his death. The inventory was taken soon after his death, and the sale to the insurance company was made the May following, about thirteen months after they had been given to the testator. The executors all joined in the assignment, in and by which they acknowledged the receipt of $7,435.78. After this assignment was executed, it, together with the bond and mortgage, was committed to the custody of Read, the obligor, and one of the executors. He, thenceforward, carried on the negotiations with the insurance company, through his brother, who resided in New York, and through one John R. Weeks, who was the attorney of the company. The company gave a check to the said Weeks for $7,435.78, and Weeks gave two checks payable to the order of said Read, one for $5,000 and one for $2,400. The former of these Read endorsed and delivered to Mr. Lippincott, one of the executors; the other he endorsed and delivered back to said Weeks. The company, therefore, actually paid $7,435.78, but the estate actually received only $5,000 thereof. The company must have been induced by these executors, either directly or indirectly, to believe that these premises were worth what they actually gave for the bond and mortgage, and that the consideration which it paid was to be received by the executors. The executors had acknowledged the receipt of this amount in the assignment, and for that amount the company gave its check.

It is true that some effort has been made by the executors to show that the mortgaged premises were not worth more than $5,000, if so much. But this testimony was offered more than

Bechtold *v.* Read.

twenty years after the assignment; and I believe it is only the testimony of the executors. Now, they say there was a depreciation of nearly $3,000, but when they took the appraisement, not only the executors but the appraisers declared under oath that the bond and mortgage were worth their face value. Whilst the testimony stands thus as to the sufficiency of the mortgage as a security for the bond, I believe there has not been any effort to show that Read was insolvent or unable to discharge the bond which he had given after exhausting the security. Besides these considerations the proof shows that the testator had great confidence in Read. Read married the testator's adopted daughter. Therefore, it cannot be concluded that the testator sought to impose upon Read, by exacting from him a bond that was not founded upon a good and valuable consideration, nor a security which was not worth the amount secured thereby. Nor has it been made clear that Read was, in any reasonable time after the death of the testator, personally unable to pay his obligations.

With respect to the transaction in the collection of this bond and mortgage and the loss resulting therefrom, all the executors are alike responsible. They are to be charged with the whole amount of the check given by the company to Weeks, less the commissions which they paid, which I believe was $280. When the executors, Bechtold and Read, joined in that assignment and committed the completion of the negotiations to Read, the mortgagor and obligor, they became responsible for all consequences which might ensue. They trusted him at their peril. He being the debtor, it was their duty to superintend the collection of this bond and mortgage. It is not necessary to discover how Read was benefited; it is only necessary to point to the fact that, by their negligence, the estate has sustained a loss. Generally speaking, each executor has the right to make collection of assets without his co-executor being liable for any loss resulting therefrom. *Fennimore* v. *Fennimore, 2 Gr. Ch. 292.* But it is very manifest that, in such cases as we are now dealing with, it must be regarded as extreme negligence for co-executors to allow one of their number, who is largely indebted to the estate, to compromise the interest of the estate as has been done here. *Laroe*

v. *Douglass*, *2 Beas. 308;* Earl v. *Earl*, *93 N. Y. 104, 112;* Clark, *Exr.*, v. *Clark*, *8 Paige 153;* Southerland v. *Bush*, *7 Johns. Ch. 17;* Lenoir v. *Winn*, *4 Dessaus. 65;* Johnson v. *Johnson*, *2 Hill Ch. 277;* Adair v. *Brimmer*, *74 N. Y. 539, 566;* Wood v. *Brown*, *34 N. Y. 337, 344;* Monell v. *Monell*, *5 Johns. Ch. 283;* Lord v. *Shipbrook*, *11 Ves. 252;* S. C., *16 Ves. 477;* *2 White & T. Lead. Cas. Eq. 1792, 1793.*

In the next place, it is to be considered how much real estate come to the hands of the executors with which, or with the proceeds of the sales thereof, they should be charged. The testimony shows that a large number of village lots were offered for sale by them and were actually sold to *bona fide* purchasers. For many, if not all, of these that were so sold Nathan S. Read, one of the executors, received the consideration either in cash or in the promissory note of the purchaser upon the delivery of the deed. Many, if not all, of the notes so received by him were delivered to Wallace Lippincott. The latter should be charged with the amount of these notes, and the former with the cash which he actually received, whether upon the delivery of the deeds or afterwards, upon the maturity of any of the notes which he may not have passed over to Mr. Lippincott.

They likewise will be required to account for all the moneys received upon the sales of lots known as the Burk lots. It appears that the testator in his lifetime conveyed a large number of lots to Burk, and that Burk paid for them by giving his bond and two mortgages, one for $17,000 and one for $10,000, and that the executors agreed with Burk to surrender the mortgages, and to accept the deed from Burk conveying to them all the lands covered by the mortgage, in satisfaction of the mortgages. So far as sales have been effected to *bona fide* purchasers of these lots they will be sustained and the executors held accountable for the consideration. If any of these Burk lots remain unsold they will be dealt with as others similarly situated in a manner hereinafter indicated.

The transactions respecting the William Leach mortgage must be governed by a like principle. The testator in his lifetime executed and delivered a deed of conveyance for a large number

of lots to William Leach, treasurer of the Riverside Cottage Company. William Leach, as such treasurer, executed and delivered to Samuel Bechtold, Jr., his bond for $24,000, and to secure the payment thereof also executed and delivered to him a mortgage upon the premises so conveyed. During the lifetime of the testator many of these lots were conveyed by the Riverside Cottage Company, Mr. Bechtold releasing the lien of his mortgage therefrom. At the time of his death a large number of these lots were still owned by the Riverside Cottage Company, and the Leach bond and mortgage were still outstanding and unsatisfied. This bond and mortgage were not included in the inventory taken by the executors. From the testimony it would appear that two of the executors had no knowledge of these instruments for at least fifteen years after the probate of the will ; yet, from what Nathan S. Read says with respect to the intention of the testator, he certainly must have had knowledge of their existence before and at the time of the testator's death. In 1888 the attention of Wallace Lippincott was directed to them. In some way he was informed that it was the intention of the testator to give them to Mary A. Read, the wife of Nathan S. Read. From his statements it is fair to conclude that he understood the testator made, or intended to make, such a gift, and because of such understanding, and because he was told that it would aid in making a final settlement of the estate, he joined with Nathan S. Read in making an assignment of the said bond and mortgage to Mary A. Read. She foreclosed the mortgage, and, by virtue of an execution issued in such foreclosure proceedings, she sold all the lots which remained unsold, covered by the mortgage, and Nathan S. Read became the purchaser.

It is perfectly clear that Mrs. Read had not the shadow of a right in law or equity to this bond and mortgage. Whatever may have been the desire or express intention upon the part of the testator in his lifetime, he never manifested either, in any way, that could be recognized as binding by any court. This is especially enforced when the fact is considered that he died leaving a last will, in and by which all of his estate, real and per-

Bechtold v. Read.

sonal, is disposed of without making any gift of these instru-
ments to Mrs. Read. . Besides this, so far as appears, he had the
entire possession and control of them up to the time of his
decease. These things being so, and Read having become the
purchaser and being the executor, he cannot retain the title to
these lands as against the legatees. The executors must, there-
fore, account for the full value of the lands thus conveyed to
Read.

The transaction with respect to the Barnes judgment must
necessarily be marshaled under the same legal principle. By
virtue of an execution issued in the lifetime of the testator upon
a judgment against him, certain lands of the testator were adver-
tised and sold. They were bid off to Barnes for about the sum
of $600. Mr. Lippincott, one of the executors, made an
arrangement with the attorney of Barnes by which, in consider-
ation of paying and advancing upon the price to be paid by
Barnes equal to the amount due upon the judgment, which was
between $800 and $900, he (Lippincott) took the title from the
sheriff. He knew before the land was sold the sheriff would
offer the property for sale. The place of sale was near by his
residence. He did not attend at the time and place when the
property was so advertised for sale, notwithstanding his interest
therein as executor, but did attend at the time and place when
and where the deed was to be delivered, and then and there
entered into the negotiations which resulted in his taking the
title. His excuse for making the purchase is that Mrs. Bechtold,
the widow of the testator, urged him thereto in order that she
might have a home, his impression being that since she had an
interest in the lands as widow he would be justified in taking
this course to satisfy or protect such interest. The court cannot
recognize or sanction any such private arrangement, however
desirable it might appear to the parties interested. The law
points out the method by which the rights of individuals in such
cases may be ascertained, adjusted and settled. But it should be
stated that the complainant insists that the amount due upon the
Barnes judgment was only $420.

The executors likewise departed from every well-settled principle in making the conveyance of certain lands to Henry A. Bechtold, one of the complainants, and a son of one of the executors, who is also a complainant. The only excuse for this is the assertion that the grantee made a claim therefor, which he rested upon the allegation that the testator had promised to convey the land to him. So far as appears, the title to the said lot is still in Henry A. Bechtold. This being so, there is no difficulty in the court decreeing that he holds it in trust for himself and the other legatees. But should it turn out, upon further investigation, that the title is in innocent third parties, the executors will be required to account for its value.

The testimony shows that certain lands were sold in October, 1873, to one Henry R. Lewis, for the consideration of $450. The executors all joined in the execution of that deed. They were alike responsible and must account for this sum, unless it can be shown that one or the other of them received it.

The same rule with respect to the liability of these executors must be observed in regard to the lands conveyed to the colored servant, A. P. Taylor; and to the lands which were conveyed to one Rhodes, and by him to said Wallace Lippincott; and the lot known as the three-cornered lot, conveyed to Mary A. Read, wife of one of the executors, and the lot conveyed to one "Joe Mitch," through Mary A. Read, in case the title to the last-named lot was in the testator at the time of his death. In case any of these lands have been conveyed to *bona fide* purchasers, the executors will be chargeable with the fair market value thereof, with interest from the 1st day of April, 1875. If any of the grantees above named still hold the said lands, or if they be held by others with knowledge, it will be decreed that they hold the same in trust for the legatees. If substantial and permanent improvements have been made, the grantee will be allowed the present value of such improvements.

The conclusions above arrived at are based upon the rule laid down by the court of errors and appeals in the case of *Marshall* v. *Carson, 11 Stew. Eq. 250.* In that case, the lands which came to the hands of the executors to be disposed of were charged

with the payment of debts. There were judgments against the testator at the time of his death, under which the lands were sold by the sheriff. At such sales, the executors named in the will became the purchasers. The court held that the executors continued to hold these lands in trust for the benefit of the *cestuis que trust*, so far as they had not been sold to *bona fide* purchasers, and so far as sold to *bona fide* purchasers they were liable for the proceeds of said sale. The court said : " The interest of such persons as purchasers in their own right is in conflict with the duty which, in their fiduciary character, they owe to creditors and beneficiaries under the will." And, also : " No trustee can directly or indirectly become a purchaser, in his own behalf, of the trust property and hold it against the *cestui que trust*." The very great frequency with which these principles are disregarded make it evident that they cannot be too often repeated nor too rigidly enforced. It would be difficult to admit of any qualification of the rule without impairing the beneficial consequences to be derived from the rule.

It may be said that the foregoing principle governs every branch or phase of the case now in hand. But if anything further be necessary to control the various transactions of these executors in having the title to the lands, which they held in trust, conveyed to themselves or to others, in conflict with the rights of the legatees, such necessity has been met by the same court of errors and appeals in the support given to the principles above laid down in the cases of *Shoemaker* v. *Bassett, 1 Dick. Ch. Rep. 538 ; Carter* v. *Burr, 1 Dick. Ch. Rep. 135 ; S. C., 2 Dick. Ch. Rep. 599,* and in *McCormick* v. *The Ocean City Association, 18 Stew. Eq. 561 ; S. C., 1 Dick. Ch. Rep. 599.* In the first of these cases the sale was made by an executor to his wife through a third person. Although the sale was at public auction, it was not allowed to stand. In the next case, one executor at a judicial sale, made upon the foreclosure of a mortgage, had the property bid off in the name of his son, to whom the title was conveyed by the sheriff. In that case, it was held that the trust was a continuing one in the hands of the executor who effected the sale, notwithstanding the conveyance to the son,

and that the property remained liable for the whole amount due upon the mortgage which was foreclosed. In the case thirdly named, this rule is regarded as so exacting that as long as the. trust continues every act of the trustee with respect thereto is regarded as in aid of the trust. In this case, the trustee held title to real estate by a title which was imperfect. After the discovery of this fact there was a judicial sale of the property so held, and the trustee became the purchaser and took title from the sheriff. Upon an effort being made to disregard this trust, it was held that such purchase by the trustee was in aid of the trust. See, also, *Creveling* v. *Fritts, 7 Stew. Eq. 135 ; Barr* v. *New York, Lake Erie and Western R. R. Co., 26 N. E. Rep. 145, 148.*

If it appears that any of the real estate of the testator was allowed to be sold for taxes, as is alleged, and that such sales were not for a full and a fair consideration, the executors must account for the difference between the actual consideration and a fair consideration. In other words, they must account for the fair market value of the lands so sold for taxes, less the amount of the taxes.

The principles above expressed will apply to all the real estate of the testator which the executors were bound to account for, and which may not have been included in any of the references heretofore made, whether the title remains in the executors or in third persons; if in the executors or in any one with knowledge, then such lands will be decreed to be held in trust for the legatees; but if in the hands of strangers, then the executors will be required to account for the value thereof.

For all lands conveyed to *bona fide* purchasers before the 1st day of April, 1875, the executors will be required to account for all principal not properly expended, with interest from the 1st day of April, 1875.

A reference will be made to a master with directions to state the account of these executors in accordance with the foregoing views. For the sake of greater completeness and certainty, directions will be given to include in said accounting and to charge the said executors with all personal property which came

to their hands, or to the hands of either of them, showing what property or money all or each received and giving them credit for all disbursements out of the same, and for the exemption allowed to the widow as well as for goods sold by the sheriff. They will also be credited with all payments made in discharge of the just debts or claims against the said deceased in his lifetime, and the proper and necessary expenses incurred in the settlement of the estate, including the expenses of advertising and selling real estate.

They will be charged with the consideration money at which. they sold real estate to *bona fide* purchasers.

The master will also be directed to report what lands remain. unsold, and what lands were conveyed to the said Lippincott,. which were offered for sale under the Barnes judgment, and in whose name the title to the said lands now is, and, if any portion. of the said lands be now owned by *bona fide* purchasers, what portion. The like directions will be given as to all the other. lands above referred to.